GARMAN TURNER GORDON LLP
GREGORY E. GARMAN, ESQ.
Nevada Bar No. 6654
E-mail: ggarman@gtg.legal
TERESA M. PILATOWICZ, ESQ.
Nevada Bar No. 9605
E-mail: tpilatowicz@gtg.legal
MARY LANGSNER, Ph.D.
Nevada Bar No. 13707
E-mail: mlangsner@gtg.legal
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
Tel: (725) 777-3000
[Proposed] *Counsel to the Debtor*

# UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF NEVADA

| In re: | Case No.: BK-25-16701-NMC |
|---|---|
| COLORART, LLC | Chapter 11 |
| Debtor. | Date: ***OST REQUESTED***<br>Time: ***OST REQUESTED*** |

**DEBTORS' EMERGENCY MOTION PURSUANT TO 11 U.S.C. §§ 105, 361, 363, AND 506, AND FED. R. BANKR. P. 4001(b) FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING THE USE OF CASH COLLATERAL <u>AND SCHEDULING A FINAL HEARING</u>**

Las Vegas Color Graphics, Inc., ("<u>LVCG</u>") and ColorArt, LLC ("<u>ColorArt</u>," and together with LVCG, the "<u>Debtors</u>"), debtors and debtors-in-possession, by and through their proposed counsel, the law firm of Garman Turner Gordon, hereby respectfully submit their motion ("<u>Motion</u>") pursuant to Sections[1] 105, 361, 363, and 506 and Bankruptcy Rule 4001(b) requesting the Court: (i) enter an interim order (the "<u>Interim Order</u>"), a proposed copy of which is attached hereto as **Exhibit "1,"** preliminarily determining the extent of Cash Collateral[2] as defined by

---

[1] Unless otherwise stated, all Chapter and Section references are to Title 11 of the U.S. Code (the "<u>Bankruptcy Code</u>"), all Bankruptcy Rule references are to the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and all references to LR are to the Local Rules of Bankruptcy Practice for the U.S. District Court for the District of Nevada (the "<u>Local Rules</u>").

[2] "<u>Cash Collateral</u>" is defined in Section 363(a) as "cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an

Section 363(a) and authorizing the interim use of Cash Collateral to operate Debtor's business in the ordinary course and pay costs of administration pending a final hearing (the "Final Hearing") in accordance with the budget (the "Budget") attached as **Exhibit "G"** to the Omnibus Decl.; and (2) setting the Final Hearing to determine the extent of Cash Collateral and authorizing Debtor to use Cash Collateral during the pendency of Debtor's Chapter 11 Case.

This Motion is made and based on the points and authorities herein, the *Omnibus Declaration of Eran Salu in Support of Debtors' Chapter 11 Petitions and First Day Motions* (the "Omnibus Decl."), the papers and pleadings on file herein, judicial notice of which are requested, and any arguments of counsel made at any hearings on the Motion.

## I. JURISDICTION AND VENUE

1. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue in this judicial district is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory basis for the Motion is sections 105, 361, 363, 506, and 553 of the Bankruptcy Code, and Bankruptcy Rules 3012 and 4001(b). Debtors continue to manage their property as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108.

2. Pursuant to Local Rule 9014.2, Debtors consent to entry of final order(s) or judgment(s) by the bankruptcy judge if it is determined that the bankruptcy judge, absent consent of the parties, cannot enter final orders for judgment consistent with Article III of the United States Constitution.

## II. SUMMARY OF RELIEF SOUGHT[3]

3. Debtors entered into a g credit agreement with Lender effective June 6, 2024, whereby Lender provided a Revolving Loans commitment to Debtors of up to $30 Million (the

---

interest and includes the proceeds, products, offspring, rents, or profits of property and the fees, charges, accounts or other property for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title."

[3] Capitalized terms in this section shall have those meanings ascribed to them the Statement of Facts section.

"Loan"), which Loan is secured by substantially all of Debtor's assets (collectively, the "Collateral").

4. As of the Petition Date, Lender contends the outstanding balance of the Loan is approximately $26,000,000.

5. On the Petition Date, Debtors had cash and cash equivalent in their bank accounts (the "Deposit Accounts") believed to be in the approximate amount[4] of $1,850,000. Pursuant to Section 552(b)(2), Lender only retains its security interest in Debtors' post-petition cash proceeds (the "Post-Petition Cash") that are identifiable and traceable directly from the pre-petition Collateral generated after the Petition Date.

6. To the extent Lender has a valid and perfected interest in Debtors' Deposit Accounts or Debtors' Post-Petition Cash constituting Cash Collateral, Debtors seek authorization to use such Cash Collateral to pay the ordinary course administrative expenses of Debtors' estates, including, but not limited to, the costs of operations, including, without limitation, utility charges, trade payables, insurance, taxes, replacement inventory, and all other expenses incurred in operating and administering Debtors' estates during their Chapter 11 Cases.

7. Attached to the Omnibus Decl. as **Exhibit "D"** is a budget of projected income and expenses for the first 90 days following the Petition Date (the "Budget").[5] Debtors propose that it be permitted a fifteen percent (15%) variance for the Budget line items to account for the inherent fluctuations in monthly expense.

8. Through the Motion, Debtors request that they be entitled to use Cash Collateral on an emergency interim basis pending the Final Hearing in accordance with the Budget, which is necessary to avoid immediate and irreparable harm to Debtors and their bankruptcy estate.

---

[4] Given NMBL's control over the accounts, Debtors do not have access to exact balances therein.

[5] The Budget will be revised and updated for each subsequent 90-day period throughout the Chapter 11 Cases. No later than fifteen (15) calendar days prior to the end of each 90-day period, Debtors will deliver to Lender a proposed budget for the next 90-day period (each such updated budget, a "Supplemental Budget"). Lender shall have five (5) days to review and approve such Budget and, if approved or if no response is received within five (5) days, such Budget shall constitute the approved Budget without further notice, motion, or application to, order of, or hearing before, the Court. To the extent that Lender objects to the Supplemental Budget and Debtors and Lender cannot agree upon a Supplemental Budget, Debtors shall be entitled to seek Court approval of such Supplemental Budget on order shortening time.

Without the authority to use Cash Collateral, Debtors will be forced to cease their operations, thereby eliminating their ability to reorganize. See Omnibus Decl. ¶ 53.

### III.   STATEMENT OF FACTS

**A.   Debtors' History and Business Operations.**

1. On November 5, 2025, Debtors filed voluntary petitions under Chapter 11 of the Bankruptcy Code, thereby commencing the Chapter 11 Cases. See ECF No. 1.

2. Debtors are some of the nation's largest printers, delivering custom print, marketing, and logistics solutions to clients ranging from Fortune 100 companies to local and regional small businesses. See Omnibus Decl. ¶ 5.

3. Collectively, Debtors operate three large scale production facilities: a facility in Las Vegas housing approximately ninety employees, a facility in Iowa housing approximately forty-five employees, and a facility in Missouri housing approximately forty employees. See Omnibus Decl. ¶ 6.

4. Debtors, through their printing facilities, print and distribute mailers for many well-known and recognized business, including affiliated entities such as Growmail LLC and Money Mailer, LLC, and unaffiliated entities such as Macy's and American Express. See Omnibus Decl. ¶ 7.

**B.   Debtors' Secured Lender.**

5. For years, Debtors operated under a credit facility from New Mexico Bank & Loan ("NMB"). However, after Debtors' credit needs grew and a representative from NMB transferred to Aequum Capital Financial II LLC ("Lender"), Lender approached Debtors about funding their credit needs. See Omnibus Decl. ¶ 8.

6. Debtors and Lender thereafter became parties to that certain *Credit and Security Agreement* dated as of June 6 2024 (as may be amended, restated, supplemented, and otherwise modified from time to time, the "Credit Agreement"), pursuant to which Lender provided a revolving credit facility to Debtors in the principal amount of up to $30,000,000 (the "Revolving Loans"). See Omnibus Decl. ¶ 9; **Exhibit "A."**

7. The Revolving Loan works as follows: Lender initially provides funding secured

by Debtors' inventory, accounts receivable, and equipment, and is repaid in part as the accounts receivables are paid. Then, based on a formula involving the value of the inventory, receivables, and equipment, Lender advances additional funds that Debtors use for business expenses and operations, which loan is again repaid in part through the accounts receivable. *See* Omnibus Decl. ¶ 10.

8. The Revolving Loans are evidenced by, among other things, a Revolving Note (the "Note") dated June 6, 2024 in the principal amount of $30,000,000. *See* Omnibus Decl. ¶ 11; **Exhibit "B."**

9. As security for their obligations under the Credit Facility, Debtors granted Lender a continuing security interest in substantially all of Debtors' assets, defined as "Collateral," and which includes, without limitation, bank accounts, deposits, Inventory, Equipment, and all proceeds of the foregoing. *See* Exhibit "A," Credit Agreement, Article 5 and § 13.02(c).

10. In connection with the Credit Agreement, JAL also executed that certain *Validity and Support Agreement,* dated as of June 6, 2024 (as may be amended, restated, supplemented or otherwise modified from time to time, the "Support Agreement") pursuant to which Lender required JAL to provide certain support services traditionally handled by JAL pursuant to a *Shared Services Agreement* (the "Shared Services Agreement") including paying payroll through JAL from funds provided by Debtors in exchange for JAL providing employees to Debtors. *See* Omnibus Decl. ¶ 13 ; **Exhibit "C."**

11. Debtors have repaid significant principal over the past approximately year and half, with Lender having collected at least $3,004,602 from receivables. *See* Omnibus Decl. ¶ 14.

12. As of the Petition Date, approximately $25,276,90 is the stated outstanding balance under the terms of the Note, comprised of principle of $24,835,758 and interest and fees of $441,148. *See* Omnibus Decl. ¶ 15.

C. **The Events Leading to Chapter 11.**

    a. **The Lender's Breach and Receivership Proceedings.**

13. On October 7, 2025, Lender filed a Petition *(i.e.,* the equivalent of a complaint in Nevada state courts) (the "Petition") together with an emergency motion for appointment of

receiver (the "Receiver Motion") against Debtors in the Circuit Court of St. Louis County, State of Missouri (the "Missouri State Court"). *See* Omnibus Decl. ¶ 16.

14. Lender alleged, among other things, that Debtors were in payment, reporting, and covenant defaults, as well as were involved in a scheme to overstate the value of the collateral. *See* Omnibus Decl. ¶ 17.

15. Lender's allegations, however, were little more than a protective defection of its own failure to comply with the requirements of the Credit Agreement. *See* Omnibus Decl. ¶ 18.

16. Specifically, at that time, Lender was refusing to fund properly requested draws causing significant damage to the Debtors, including the loss of at least one large customer. *See* Omnibus Decl. ¶ 19.

17. Debtors had requested draws from Lender in accordance with Section 2.01 of the Credit Agreement, which provides that the lender "shall make" revolving loans under the agreement. Credit Agreement, § 2.01. Lender, however, failed to fund those requests under the guise of always requesting more information effectively cutting off Debtors' access to operating funds and breaching Lender's own contractual obligations. *See* Omnibus Decl. ¶ 20.

18. Faced with an immediate liquidity crisis that jeopardized payroll, vendor relationships, and customer obligations, Debtors were required to take immediate actions to preserve the companies' operations and protect their underlying value. *See* Omnibus Decl. ¶ 21.

19. Lender then used this crisis it created, along with Debtors' response thereto and a myriad of other pretextual alleged misrepresentations or consistories, as a basis for its Petition and Receiver Motion. *See* Omnibus Decl. ¶ 22.

20. Just two days after filing its Petition, and even before severing Debtors, on October 9, 2025, Lender filed a Notice of Hearing setting its emergency Receiver Motion for hearing on October 15, 2025, on short notice and in violation of Missouri Rule 44.01(c). *See* Omnibus Decl. ¶ 23.

21. The Missouri State Court proceeded with an evidentiary hearing on October 20, 2025, which was time limited thereby limiting Debtors' ability to preset a full and complete defense to the concocted allegations. *See* Omnibus Decl. ¶ 24.

22. On October 29, 2025, the Missouri State Court entered the *Order Appointing Receiver* (the "Order"), appointing NBML Strategies ("NMBL") as receiver over the Receivership Assets (as defined in the Order). *See* Omnibus Decl. ¶ 25.

23. As set forth in the Omnibus Declarations, Debtors have significant and valid defenses to the allegations raised with respect to the request for appointment of a receiver, but was not able to fully and fairly present them due to the Court holding a truncated hearing. *See* Omnibus Decl. ¶ 27.

24. Ultimately, these Chapter 11 proceedings became necessary for Debtors to protect their significant operations as a going concern, protect the jobs of its nearly 200 employees, and reorganize to ensure that, in addition to its Lender, its trade creditors, counterparties, vendors, and customers are not harmed. *See* Omnibus Decl. ¶ 26.

**D.     The Debtors' Cash and Needs for Operations.**

25. On the Petition Date, Debtors had cash in Deposit Accounts believed to be in the approximate amount[6] of $1,850,000. Other than an account at Wells Fargo, for which Lender holds a deposit account control agreement (for which NMBL has indicated that the Lender had failed to provide the Receiver with possession or control of the account in contravention of the Missouri court order appointing the receiver), the cash was in the possession of or under the control of the NMBL. Debtors have demanded turnover of its accounts from NMBL, but Lender has objected to the demand resulting in Debtors being improperly deprived of estate assets. *See* Omnibus Decl. ¶ 49.

26. Debtors cannot meet their ongoing post-position obligations unless they have the immediate ability to use the Deposit Accounts and their Post-Petition Cash. In the absence of such use, immediate and irreparable harm will result to Debtors, their estates, and their creditors, and will render an effective and orderly reorganization of Debtors' businesses impossible. *See* Omnibus Decl. ¶ 50.

---

[6] Given NMBL's control over the accounts, Debtors do not have access to exact balances therein.

27. An integral aspect of maintaining Debtors' business operations is Debtors' ability to use the Deposit Accounts and Post-Petition Cash to maintain a sufficient level of working capital in order to pay ordinary course obligations such as those to its employees, vendors, utilities, taxing authorities, insurance, and to pay for necessary ordinary business expenses. Debtors also require the use of the Cash Collateral to obtain new supplies to generate additional accounts receivable Omnibus Decl. ¶ 51.

### IV.    LEGAL ARGUMENT

**A.    Statutory Framework.**

Section 363(a) defines "cash collateral" as:

> Cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

Section 363 provides that a debtor in possession may not use, sell, or lease cash collateral unless: (1) each entity with an interest in such cash collateral consents; *or* (2) the court, after notice and hearing, authorizes the use, sale, or lease of such cash collateral in accordance with the provisions of Section 363. *See* 11 U.S.C. § 363(c)(2). "[A]t any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). While the Debtor has the burden of proof on the issue of adequate protection, the entity claiming an interest in the alleged cash collateral has the burden of proof on the issue of validity, priority, and/or extent of its interest in the property. *See* 11 U.S.C. § 363(p); *In re Las Vegas Monorail Co*., 429 B.R. 317, 328 (Bank. D. Nev. 2010). Whether an entity has a security interest in a particular type of property is generally determined by state law. *See Butner v. United States*, 440 U.S. 48, 57 (1979); *Raleigh v. Illinois Dep't of Revenue*, 530 U.S. 15, 20 (2000).

The "interest" set forth in Section 363(a) refers to a valid and perfected security interest between the parties that secures the cash collateral. *See In re Prospect Studios*, L.P., 478 B.R. 367 (Bankr. W.D. Mo. 2012); *In re Corner Pockets of the Sw., Inc.*, 85 B.R. 559, 562 (Bankr. D. Mont. 1988) (stating that only perfected security interests give rise to "cash collateral" as defined by Section 363); *Waldron v. Nw. Acceptance Corp.* (*In re Johnson*), 62 B.R. 24, 28-29 (B.A.P. 9th Cir. 1986). Section 363(e) provides, in relevant part, that "at any time, on request of an entity that has an interest in property used . . . or proposed to be used, by the trustee, the court, with or without a hearing, shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).

A party seeking to establish the "extent" of its interest in property under Section 363(p)(2) must satisfy a two-prong test: "First, as a preliminary matter, the party must prove that it holds a perfected security interest in post-petition revenues to which its liens still rightly attach. Second, a party must prove the amount of money to which its liens attach." *See id.* (citing *Chequers Inv. Assocs. v. Hotel Sierra Vista Ltd. P'ship* (*In re Hotel Sierra Vista Ltd. P'ship*), 112 F.3d 429, 434 (9th Cir. 1997).

As previously set forth herein, the Credit Agreement granted Lender a security interest in the Collateral. However, pursuant to Nevada law, a security interest in cash, cash equivalents, or a deposit account may solely be perfected by possession or control.[7] On the Petition Date, other than the Wells Fargo account, Debtors' Deposit Accounts were neither in the possession of nor under the control of Lender.

Commencing on the Petition Date and each day thereafter, as set forth in the Budget, Debtors will generate revenue (the "Post-Petition Cash"), which are generally not Lender's Cash Collateral. Prepetition security interests generally do not extend to property acquired postpetition,

---

[7] See NRS 104.9312(2) (providing in pertinent part that: "(a) a security interest in a deposit account may be perfected only by control under NRS 104.9314;.... (c) a security interest in money may be perfected only by the secured party's taking possession under NRS 104.9313"); see also Rus, Miliband & Smith, APC v. Yoo (In re Dick Cepek, Inc.), 339 B.R. 730, 740 (B.A.P. 9th Cir. 2006); see also NRS 104.9313(1) (providing in relevant part that "a secured party may perfect a security interest in negotiable documents, goods, instruments, money, or tangible chattel paper by taking possession of the collateral.").

except for certain limited exceptions.  Section 552 of the Bankruptcy Code provides, in relevant part, as follows:

> (a) Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.
>
> (b)(1) Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, products, offspring, or profits of such property, then such security interest extends to such proceeds, products, offspring, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law, **except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.**

11 U.S.C. § 552 (emphasis added).

Thus, Section 552(a) severs a pre-petition floating lien at the petition date.  *See Philip Morris Capital Corp. v. Bering Trader, Inc. (In re Bering Trader, Inc.)*, 944 F.2d 500, 502 (9th Cir.1991) ("The purpose of § 552(a) is 'to allow a debtor to gather into the estate as much money as possible to satisfy the claims of all creditors.'").

Section 552(b)(1) provides a ***narrow*** exception, restoring a pre-petition lien only to the limited extent that the post-petition property is "proceeds, products, offspring, or profits" of pre-petition collateral.  *See In re Las Vegas Monorail Co.*, 429 B.R. 317, 327 (Bank. D. Nev. 2010); *Philip Morris Capital Corp. v. Bering Trader, Inc. (In re Bering Trader)*, 944 F.2d 500, 502 (9th Cir. 1991) (wherein the Ninth Circuit emphasized the Section 552(b) "explicitly lists the types of property to which a security interest continues" and refused to enlarge the list).

To qualify as a "proceed," the property must "necessarily derive[ ] from the sale, exchange or other dispensation of other encumbered property." *Philip Morris Capital Corp. v. Bering Trader, Inc. (In re Bering Trader)*, 944 F.2d 500. 502 (9th Cir. 1991); *see also* U.C.C. § 9-102(a)(64) (2001) (defining proceeds as "whatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral " or "whatever is collected on, or distributed on account

of, collateral"). Stated another way, only property that is directly attributable to pre-petition collateral, without the addition of estate resources, can qualify as proceeds. *See 5 Collier on Bankruptcy* ¶ 552.02[2][a] (*Alan N. Resnick & Henry J. Sommer eds.*, 16th ed. 2011); *In re Delco Oil, Inc.,* 365 B.R. 246, 249 (Bankr. M.D. Fla. 2007). Courts addressing the general issue of what constitutes proceeds have consistently held that revenue derived from the use of collateral, as opposed to the disposition or diminution of collateral, are not "proceeds." *See In re S & J Holding Corp.*, 42 B.R. 249, 250 (Bankr. S.D. Fla. 1984); *CLC Equip. Co. v. Brewer (In re Value-Added Commc'n, Inc.),* 139 F.3d 543, 546 (5th Cir. 1998); *In re Las Vegas Monorail*, 429 B.R. 317, 333-34 (Bankr. D. Nev. 2010).

The Ninth Circuit BAP applied this principle to accounts receivable in *In re Skagit Pacific Corp.*, holding that post-petition accounts are not 'proceeds' of prepetition collateral when they arise from post-petition performance; "proceeds of post-petition accounts receivable do not fall within the § 552(b) proceeds exception." *In re Skagit Pacific Corp.,* 316 B.R. 330, 336 (B.A.P. 9th Cir. 2004). The BAP expounded "revenue generated post-petition solely as a result of a debtor's labor is not subject to a creditor's pre-petition interest." *Id.* (citing *In re Cafeteria Operators*, 299 B.R. 400, 405 (Bankr. N.D. Tex. 2003)). "[W]hat is produced by the debtor's added value by its labor (or the value added by others' labor) throughout the process of the reorganization effort will likewise not be subject to a creditor's pre-petition interest. *See id.* (citing *In re Package Design & Supply Co.*, 217 B.R. 422, 426 (Bankr.W.D.N.Y.1998) (consequences of added value may cause a commingling or other traceability problem that destroys the lien entirely)); s*ee also In re Las Vegas Monorail Co.*, 429 B.R. 317, 345 (Bank. D. Nev. 2010) (affirmatively citing *Skagit Pacific* and noting that even when one seeks to do an allocation of contributions between the collateral and the efforts of the debtor "often the efforts of the estate in generating the income predominate the allocation.").

Were the Court to determine that certain of Debtors' post-petition revenue falls within the narrow ambit of Section 552(b), the Court should limit any application of Section 552(b) "based on the equities of the case." Here, because the estates' post-petition efforts and risk (organizing

labor and continued operations) create the post-petition revenue, it is inequitable to divert that value to the pre-petition lien.

Furthermore, the equities of the case necessitate authorizing Debtors to make the specific payments required to enable Debtors to continue to operate to satisfy their liabilities. As aptly explained by the United States Bankruptcy Court for the Southern District of New York:

> Even if there is a valid security interest in post-petition acquired property constituting the proceeds, products, offspring, or profits of pre-petition collateral, § 552(b)(1) still allows a court to trump a pre-petition lien to this post-petition acquired property after notice and a hearing and based on the equities of the case. Depending on equities of the case, profit or loss of the property may be given to the estate or to the secured party, or apportioned between them. The equities of the case doctrine is intended to ensure that secured creditors do not receive a windfall benefit when a trustee uses assets of the estate, for example, to finish uncompleted inventory, and it is also used to adjust recovery by a secured creditor in situations where there is an improvement or decline in the post-petition collateral, especially in situations where the change in value is brought about by a party in the bankruptcy.

*In re Barbara K. Enterprises, Inc.,* 2008 WL 2439649 *11 (Bankr. S.D.N.Y. 2008).

Furthermore, the case law and the legislative history accompanying Section 552(b) similarly demonstrate that this equitable exception applies where an expenditure of estate funds increases the value of the collateral subject to the security interest in question, rather than depletes it. *See* H. Rep. No. 595, 95th Cong., 1st Sess. 376-77 (1977); *see also J. Catton Farms, Inc. v. First Nat. Bank of Chicago*, 779 F.2d 1242, 1246 (7th Cir. 1985); *Wolters Village, Ltd. v. Village Props., Ltd. (In re Village Props., Ltd.)*, 723 F.2d 441, 444 (5th Cir. 1984). Indeed,

> [w]hen the secured creditor has undertaken affirmative action to protect its right to post-bankruptcy rents, . . . the courts have tended to limit the use to which the rents might be put. For the most part, Debtor in possession or trustee is permitted to use the rents for purposes of maintaining the property, for making real estate tax payments and, if there is a surplus, to make mortgage amortization payments. **These holdings comport with the requirement of adequate protection.**

*Saline State Bank v. Mahloch*, 834 F.2d 690, 693 n.7 (8th Cir. 1987) (emphasis added); *see also Hartsgan v. Pine Lake Village Apt. Co. (In re Pine Lake Village Apt. Co.)*, 16 B.R. 750 (Bankr. S.D.N.Y. 1982) (holding that despite the absence of a creditor's consent to debtor's use of post-petition cash collateral, debtor was authorized to use cash collateral to maintain its apartment property, and that this would ensure that the creditor was adequately protected); *In re Carbone*

*Companies, Inc.*, 395 B.R. 631, 636-637 (Bankr. N.D. Ohio 2008); *In re Franklin Pembroke Venture II*, 105 B.R. 276, 278 (Bankr. E.D. Pa. 1989); *McCombs Properties VI, Ltd. v. First Texas Sav. Ass'n (In re McCombs Props. VI, Ltd.),* 88 B.R. 261 (Bankr. C.D. Cal. 1988) (authorizing debtor's use of cash collateral to improve a building as the proposed renovation was likely to maintain or even increase the value of the secured creditor's collateral, thereby adequately protecting the lender); *In re Gunnison Center Apartments, LP*, 320 B.R. 391, 397-399 (Bankr. D. Colo. 2005) (finding that a secured creditor was adequately protected where the cash collateral was utilized to "operate the property in good fashion, pay the expenses of operation and the costs of maintenance to preserve and protect the property, and account for the monies received and the expenses paid").

**B.     Debtors Should, to the Extent Cash Collateral, be Permitted to Use the Deposit Accounts and Post-Petition Revenue.**

Debtors should be authorized to use the Deposit Accounts and Post-Petition Cash in order to protect the Collateral and, in turn, Debtors' estate and creditors. As illustrated by the Budget, Debtors are only seeking to use their revenue to preserve, maintain, and operate their businesses in the ordinary course of the business. Each expense included within the Budget is a necessary expense to maintain, preserve, and/or operate the Debtors' business, which is Debtors' sole means of generating revenue. Maintaining and operating the businesses provides adequate protection of any secured claim, as operating the business is the sole means of generating revenue, thereby increasing the value of the businesses, and providing the resources for Debtors to reorganize. *See* Omnibus Decl. ¶ 52.

As illustrated by the Budget, Debtors are seeking to use their post-petition revenue to ensure that they can continue to operate to pay their liabilities and reorganize. Each expense included within the Budget is necessary to ensure Debtors are able to continue generating revenue.

In *In Las Vegas Monorail Company*, Judge Bruce A. Markell explained how continuing revenue-generating operations serves as adequate protection:

> Moreover, LVMC's use of the cash it generates in its operations is itself a form of adequate protection. This is because LVMC's continued investment in, and operation of, the monorail will increase, or at least maintain, the collateral's value.

> A shuttered monorail will not generate any revenue, but every additional rider on the monorail will generate additional cash for distribution to the noteholders, after LVMC pays reasonable expenses. The Trustee has offered no evidence that monorail ridership is decreasing, as it would have needed to obtain additional adequate protection of its prepetition interests. This follows from the Supreme Court's decision in *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). In that case, the Court held that when collateral was not diminishing in value, the mere passage of time did not warrant adequate protection. *See id.* at 382, 108 S.Ct. 626; *In re Integrated Health Services, Inc.*, 260 B.R. 71, 74 (Bankr. D.Del. 2001) (denying adequate protection or stay relief because the creditor failed to provide sufficient evidence showing that the value of the collateral was declining); *In re Elmira Litho, Inc.*, 174 B.R. 892, 902 (Bankr. S.D.N.Y. 1994); *In re Continental Airlines, Inc.,* 134 B.R. 536, 544 (Bankr. D.Del. 1991) (citing *Timbers* for the proposition that: 'An undersecured creditor is only entitled to adequate protection payments if its collateral is declining in value.'). Rather, the Debtor's expenditures keep the monorail running and preserve the Trustee's expectation in net revenues as their primary collateral.
>
> In a similar manner, other courts have found that a debtor's use of cash collateral to maintain properties from which rents are being generated is a sufficient form of adequate protection. *See Federal Nat'l Mortg. Ass'n v. Dacon Bolingbrook Assocs. Ltd. P'ship.* 153 B.R. 204, 214 (N.D.Ill.1993) ("[T]he required adequate protection of Rents is satisfied to the extent the Debtor reinvests the rents in the operation and maintenance of the property because the value of the secured creditor's interest in its collateral will thereby be increased."); *In re 499 W. Warren Street Assocs., Ltd. P'ship*, 142 B.R. 53, 58 (Bankr. N.D.N.Y. 1992) (allowing the use of cash collateral to maintain property); *McCombs Prop. VI, Ltd. v. First Texas Sav. Ass'n (In re McCombs Prop. VI, Ltd.)*, 88 B.R. 261, 267 (Bankr. C.D. Cal. 1988) (holding that rents could be spent to make repairs or renovations that would increase rent flow even without equity cushion); *In re Stein*, 19 B.R. 458, 460 (Bankr. E.D.Pa. 1982).

*In re Las Vegas Monorail Co.*, 429 B.R. 317, 341–42 (Bankr. D. Nev. 2010).

Consistent with the *Las Vegas Monorail*, the payment of the operational expenses set forth in the Budget enhance rather than diminish the value of the Lender's interest by generating cash for the payment of claims. Thus, Debtors have met their burden of showing that the Lender's interests (if any) are adequately protected, and Debtors should be granted authority by this Court to use their revenue as such use will enhance, not diminish, the value of the estates and any interest in Debtors' post-petition revenue.

Debtors further propose period payments to Lender as set forth in the Budget and providing replacement liens to Lender to extent that it can establish a validly perfected security interest in

cash collateral, such that Lender shall receive pursuant to Section 361(2) of the Bankruptcy Code, valid and perfected replacement security interests in and liens upon the Debtors' assets and property, and proceeds thereof, but in all events, only to the extent of: (i) any post-petition decrease in value of its properly perfected security interests resulting from the use of cash collateral herein, and (ii) to the extent of its pre-petition properly perfected security interest in and to any of Debtor's property (the "Replacement Liens").

Further, authorizing Debtors' use of any cash collateral is consistent with the Bankruptcy Code's policy of favoring reorganization. A bankruptcy court, where possible, should resolve issues presented in favor of reorganization. *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984) ("[t]he fundamental purpose of reorganization is to prevent a debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources."); *United States v. Whiting Pools, Inc.,* 462 U.S. 198, 203 (1983) ("By permitting reorganization, Congress anticipated that the business would continue to provide jobs, to satisfy creditors' claims, and to produce a return for its owner.

The U.S. Court of Appeals for the Tenth Circuit summarized this principle as follows:

> Because the ultimate benefit to be achieved by a successful reorganization inures to all the creditors of the estate, a fair opportunity must be given to Debtors to achieve that end. Thus, while interests of the secured creditor . . . are of concern to the court, the interests of all the creditors also have bearing upon the question of whether use of cash collateral shall be permitted during the early stages of administration.
>
> The first effort of the court must be to insure that the value of the collateral will be preserved. Yet, prior to confirmation of a plan of reorganization, the test of that protection is not to be the same measurements applied to the treatment of a secured creditor in a proposed plan. In order to encourage Debtors' efforts in a formative period prior to the proposal of a reorganization, the court must be flexible in approving the adequate protection standard.

*In re O'Connor*, 808 F.2d 1393, 1397 (10th Cir. 1987).

Granting Debtor's request to use cash collateral to pay its ordinary course expenses is in keeping with the Bankruptcy Code's general policy favoring reorganization, particularly as such relief will not result in the diminution of collateral.

/ / /

**C.      The Need for Immediate Relief Pending a Final Hearing.**

Pursuant to Bankruptcy Rule 4001(b), a final hearing on a motion to use cash collateral may not be commenced earlier than fourteen (14) days after service of such motion. The Court, however, is authorized to conduct an expedited hearing prior to the expiration of such fifteen-day period and to authorize the use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

The Ninth Circuit has recognized that immediate interim relief may be crucial to the success of a business reorganization:

> We realize that in certain circumstances, the entire reorganization effort may be thwarted if emergency leave is withheld and that reorganization under the Bankruptcy Code is perilous process, seldom more so that at the outset of the proceeding when the debtor is often without sufficient cash flow to fund a central business operation. It is for this reason that Congress specified that hearings concerning the use of cash collateral shall be scheduled in accordance with the needs of the debtor.

*Owens-Corning Fiberglas Corp. v. Center Wholesale, Inc.* (*In re Center Wholesale, Inc.*), 759 F.1d 1440, 1449 n.21 (9th Cir. 1985) (quotations omitted).

Pursuant to Bankruptcy Rule 4001(b), Debtors request that the Court (i) schedule the Interim Hearing to consider approval of Debtors' use of cash collateral, and (ii) authorize Debtors, pursuant to the terms of the Interim Order, to use cash collateral in accordance with the Budget pending the Final Hearing. If Debtors are unable to obtain the immediate use of cash collateral and is denied the ability to use the income generated from the business pending the Final Hearing, it will significantly impair Debtors' ability to maintain its business thereby resulting in immediate and irreparable harm to the value of Debtor's business and ultimately the estate and its creditors. *See* Omnibus Decl. ¶ 53.

**F.      Waiver of the Stay on the Effectiveness Is Warranted.**

Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." In view of the urgency of the relief requested herein, the risk to Debtors' operations if immediate relief with authority to fund the amounts requested in the Order is not granted, and that Debtors may not be able to fund operations through the expiration of the fourteen-day period,

Debtors request that this Court waive the stay under Bankruptcy Rule 6004(h) and provide that the relief granted in the Order is effective immediately.

G. **Reservation of Rights.**

For the avoidance of doubt, nothing contained herein is intended or shall be construed as: (i) an admission as to the validity of any claim against Debtors; (ii) a waiver of Debtors' or any party in interest's rights to dispute the validity, priority or extent of any lien or claim; or (iii) an approval or assumption of any agreement or lease under Section 365. Likewise, if this Court grants the relief sought herein, any payment authorized pursuant to the Court's order is not intended and should not be construed as an admission to the validity, priority, or extent of any lien or claim, or a waiver of Debtors' rights to dispute such lien or claim subsequently.

V. **CONCLUSION**

WHEREFORE, Debtors requests that the Court enter the Interim Order thereby: (1) authorizing and approving Debtors' interim use of cash and cash collateral in accordance with the Budget subject to a 15% variance on the expenses; and (2) scheduling a Final Hearing on use of cash and cash collateral no sooner than fourteen (14) days after the Interim Hearing.

DATED this 7th day of November, 2025.

GARMAN TURNER GORDON LLP

By: /s/ Teresa Pilatowicz
　　GREGORY E. GARMAN, ESQ.
　　TERESA M. PILATOWICZ, ESQ.
　　MARY LANGSNER, Ph.D.
　　7251 Amigo Street, Suite 210
　　Las Vegas, Nevada 89119
　　*Proposed Counsel to the Debtors*