GARMAN TURNER GORDON LLP
GREGORY E. GARMAN, ESQ.
Nevada Bar No. 6654
E-mail:  ggarman@gtg.legal
TERESA M. PILATOWICZ, ESQ.
Nevada Bar No. 9605
E-mail:  tpilatowicz@gtg.legal
MARY LANGSNER, Ph.D.
Nevada Bar No. 13707
E-mail: mlangsner@gtg.legal
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
Tel: (725) 777-3000
[Proposed] *Counsel to the Debtor*

**UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF NEVADA**

| In re:<br><br>COLORART, LLC,<br><br>Debtor. | Case No.: BK-25-16701-nmc<br><br>Chapter 11<br><br>Date:  OST REQUESTED<br>Time:  OST REQUESTED |
|---|---|

**OMNIBUS DECLARATION OF ERAN SALU IN SUPPORT OF CHAPTER 11 PETITONS AND FIRST DAY MOTIONS**

I, Eran Salu, hereby declare, under penalty of perjury under the laws of the United States, as follows:

1.  I am over the age of 18 and mentally competent and I make this declaration in support of the Chapter[1] 11 petitions of Las Vegas Color Graphics, Inc. ("LVCG") and ColorArt, LLC ("ColorArt," and together with LVCG, the "Debtors"), and *Debtors' Emergency Motion for Joint Administration* (the "Joint Administration Motion"),  *Debtors' Emergency Motion For Entry of Interim Approval Order Pursuant to Bankruptcy Rule 4001(b) and LR 4001(b); (1) Preliminarily Determining Extent of Cash Collateral and Authorizing Use of Cash Collateral By Debtors; and*

---

[1] All references to "Chapter" and "Section" herein shall be to the Bankruptcy Code appearing in Title 11 of the U.S. Code; all references to a "Bankruptcy Rule" shall refer to the Federal Rules of Bankruptcy Procedure; and all references to "LBR" shall refer to the Local Rules of Practice of the United States Bankruptcy Court, District of Nevada.

*(2) Scheduling a Final Hearing to Determine Extent of Cash Collateral and Authorizing Use of Cash Collateral by Debtors* (the "Cash Collateral Motion"); *Debtors' Emergency Motion for Order: (I) Authorizing Debtor to Pay Wages, Salaries, Benefits, and Other Employee Obligations; and (II) Authorizing and Directing Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations* (the "Employee Wage Motion"); and *Debtors' Emergency Motion Pursuant to 11 U.S.C. §§ 105(a) and 366 for an Order Determining that Adequate Assurance Has Been Provided to the Utility Companies* (the "Utility Motion" and together with the Joint Administration Motion, Cash Collateral Motion, the Employee Wage Motion, the Utility Motion, the "First Day Motions").[2]

2. Debtors filed their petition for relief under Chapter 11 of the Bankruptcy Code on November 5, 2025 (the "Petition Date").

3. I am the founder and president of the JAL Equity Corp. ("JAL"), which is the sole member of ColorArt, which is the sole shareholder of LVCG. In my capacity as such, I am familiar with Debtors' daily business, operations, and financial affairs. Except as otherwise indicated, all of the facts set forth in this Declaration are based upon my personal knowledge of Debtors' operations and finances, information learned from my review of relevant documents, and information supplied to me by other members of Debtors' management and Debtor's business and legal advisors. If called upon to testify as to the content of this Declaration, I could and would do so.

A. **Debtors' History and Business Operations.**

4. JAL owns and operates multiple marketing, printing, signage promotion, and e-commerce businesses.

5. Debtors are subsidiaries of JAL and are some of the nation's largest printers, delivering custom print, marketing, and logistics solutions with clients ranging from Fortune 100 companies to local and regional small businesses.

---

[2] All capitalized, undefined terms shall have the meaning ascribed to them in the applicable First Day Motion.

6. Collectively, Debtors operate three large scale production facilities: a facility in Las Vegas housing approximately ninety employees, a facility in Iowa housing approximately forty-five employees, and a facility in Missouri housing approximately forty employees.

7. Debtors, through their printing facilities, print and distribute mailers for many well-known and recognized businesses, including affiliated entities, such as Growmail, LLC and Money Mailer, LLC, and unaffiliated entities, such as Macy's and American Express.

**B.    Debtors' Secured Lender.**

8. For years, Debtors operated under a credit facility from New Mexico Bank & Loan ("NMB"). However, after Debtors' credit needs grew and a representative from NMB transferred to Aequum Capital Financial II LLC ("Lender"), Lender approached Debtors about funding their credit needs.

9. Debtors and Lender thereafter became parties to that certain *Credit and Security Agreement* dated as of June 6, 2024 (as may be amended, restated, supplemented, and otherwise modified from time to time, the "Credit Agreement"), pursuant to which Lender provided a revolving credit facility to Debtors in the principal amount of up to $30,000,000 (the "Revolving Loans"). A true and correct copy of the Credit Agreement is attached hereto as **Exhibit "A."**

10. The Revolving Loan works as follows: Lender initially provides funding secured by Debtors' inventory, accounts receivable, and equipment, and is repaid in part as the accounts receivables are paid. Then, based on a formula involving the value of the inventory, receivables, and equipment, Lender advances additional funds that Debtors use for business expenses and operations, which loan is again repaid in part through the accounts receivable.

11. The Revolving Loans are evidenced by, among other things, a Revolving Note (the "Note") dated June 6, 2024, in the principal amount of $30,000,000. A true and correct copy of the Revolving Note is attached hereto as **Exhibit "B."**

12. As security for their obligations under the Credit Facility, Debtors granted Lender a continuing security interest in substantially all of Debtors' assets, defined as "Collateral," and which includes, without limitation, bank accounts, deposits, Inventory, Equipment, and all proceeds of the foregoing. *See* Exhibit "A," Credit Agreement, Article 5 and § 13.02(c).

13. In connection with the Credit Agreement, JAL also executed that certain *Validity and Support Agreement,* dated as of June 6, 2024 (as may be amended, restated, supplemented or otherwise modified from time to time, the "Support Agreement") pursuant to which Lender required JAL to provide certain support services traditionally handled by JAL pursuant to a *Shared Services Agreement* (the "Shared Services Agreement") including paying payroll through JAL from funds provided by Debtors in exchange for JAL providing employees to Debtors. A true and correct copy of the Support Agreement is attached hereto as **Exhibit "C"**

14. Debtors have repaid significant principal over the past approximately year and half, with Lender having collected at least $3,004,602 from receivables.

15. As of the Petition Date, approximately $25,276,906 is the stated outstanding balance under the terms of the Note, comprised of principle of $24,835,758 and interest and fees of $441,148.

C. **The Events Leading to Chapter 11.**

  a. **The Lender's Breach and Receivership Proceedings.**

16. On October 7, 2025, Lender filed a Petition *(i.e.,* the equivalent of a complaint in Nevada state courts) (the "Petition") together with an emergency motion for appointment of receiver (the "Receiver Motion") against Debtors in the Circuit Court of St. Louis County, State of Missouri (the "Missouri State Court").

17. Lender alleged, among other things, that Debtors were in payment, reporting, and covenant defaults, as well as were involved in a scheme to overstate the value of the Collateral.

18. Lender's allegations, however, were little more than a protective defection of its own failure to comply with the requirements of the Credit Agreement.

19. Specifically, at that time, Lender was refusing to fund properly requested draws causing significant damage to the Debtors, including the loss of at least one large customer.

20. Debtors had requested draws from Lender in accordance with Section 2.01 of the Credit Agreement, which provides that the lender "shall make" revolving loans under the agreement. Credit Agreement, § 2.01. Lender, however, failed to fund those requests under the

guise of always requesting more information effectively cutting off Debtors' access to operating funds and breaching Lender's own contractual obligations.

21. Faced with an immediate liquidity crisis that jeopardized payroll, vendor relationships, and customer obligations, Debtors were required to take immediate actions to preserve the Debtors' operations and their underlying collateral.

22. Lender then used this crisis it created, along with Debtors' response thereto and a myriad of other pretextual alleged misrepresentations or inconsistencies as a basis for its Petition and Receiver Motion.

23. Just two days after filing its Petition, and even before serving Debtors, on October 9, 2025, Lender filed a Notice of Hearing setting its emergency Receiver Motion for hearing on October 15, 2025, on shortened notice and in violation of Missouri Rule 44.01(c).

24. The Missouri State Court ultimately proceeded with an evidentiary hearing on October 20, 2025, which was time-limited thereby limiting Debtors' ability to preset a full and complete defense to the false and misconstrued allegations.

25. Nonetheless, on October 29, 2025, the Missouri State Court entered the *Order Appointing Receiver* (the "Order"), appointing NBML Strategies ("NMBL") as receiver over the Receivership Assets (as defined in the Order).

26. Ultimately, these Chapter 11 proceedings became necessary for Debtors to protect their significant operations as a going concern, protect the jobs of its more than 200 employees, and reorganize to ensure that, in addition to its Lender, its trade creditors, counterparties, vendors, and customers are not harmed by Lender's actions.

**b. The Debtors' Defenses to Lender's Allegations.**

27. Debtors continue to strongly dispute the allegations made by Lender in support of their Petition and Receiver Motion. In fact, each of the alleged bases resulted from simple accounting errors that have been corrected and never impacted the Revolving Loans and/or Debtors' ability to make payments thereon.

1. **Lender's allegation that there were duplicate invoices in the March and April 2025 reports resulted from inadvertent error, not misconduct, and were promptly corrected by Debtors months before Lender filed the Petition.**

28. Lender alleged that Debtors submitted duplicate invoices in connection with establishing their borrowing base for advances in 2025 under the Revolving Loans.

29. While there were some duplicates, these entries were the result of inadvertent administrative error, not intentional misconduct.

30. The duplication resulted from routine data-entry mistakes. Debtors, constantly working to improve on their accounting systems as their businesses grow, hired a new accounts receivable lead in the first quarter of 2025. The new lead implemented new systems which included renaming some accounts that she was initially unable to locate. This resulted in certain invoices being listed twice.

31. However, after Lender brought these errors to Debtors' attention, Debtors acted immediately to correct the error. Importantly, there was no financial shortfall resulting from the duplication. Debtors promptly corrected the affected invoices, reconciled their accounts, and, where necessary, made appropriate payments to ensure accuracy. Lender, for its part, never accused Debtors of concealment or fraud following Debtors' swift remediation and full disclosure of the matter.

32. In short, the duplicate invoices occurred long ago and were innocent, promptly corrected mistakes, addressed in good faith and without any intent to mislead or harm Lender. This isolated administrative error provides no basis to question Debtors' integrity or management of the Debtors' businesses.

2. **Lender's difficulty verifying accounts receivable was a result of Lender's attempt to speak with low-level accounting staff not authorized or trained to provide the information requested.**

33. Lender claimed that it was unable to verify Debtors' accounts receivable, which was both inaccurate and misleading.

34. Debtors provided multiple avenues for Lender to confirm the validity of the receivables, and that any alleged verification issues stemmed from Lender's own choices—not from any lack of cooperation by Debtors.

35. Verifying invoices is a straightforward process that involves reviewing customer purchase orders, shipping confirmations, and corresponding payment data—all of which were provided to Lender. Despite having complete access to the materials necessary to confirm the invoices, Lender contended that Debtors obstructed its consultants' review by denying it access to their customer portals. That contention is simply inaccurate.

36. Lender's own consultant who was tasked with verifying Debtors' receivables told Debtors' representatives "[l]ooks like we have everything."

37. The customer portal is an internal tool used to allow clients to track orders, invoices, and shipments.

38. The problem was Lender unexpectedly demanded login credentials— something it had never previously requested or been granted under the parties' business relationship. Debtors appropriately declined that demand but immediately offered a live screenshare of the portals to allow Lender to verify the same information in real time.

39. In addition, Debtors went further by providing Lender with direct contact information for their customers, enabling Lender to independently verify the receivables through direct communication. Any delay or lag time in hearing back from those customers was entirely outside of Debtors' control. Debtors cannot compel third-party clients to respond on Lender's timeline, and any such delays cannot reasonably be characterized as obstruction or lack of cooperation by Debtors.

40. At no point did Debtors, or any member of their team, refuse to cooperate with Lender's efforts to verify receivables. To the contrary, Debtors worked proactively to assist Lender in confirming the invoices' accuracy and even supplied customer contact information to facilitate direct verification. Debtors acted in good faith throughout the process. Lender's purported inability to verify the accounts receivable does not reflect fraud or concealment; it reflects Lender's own

internal shortcomings and refusal to utilize the verification methods offered. Such unsupported complaints fall far short of justifying the extraordinary remedy of a receivership.

41. In addition, Lender alleged that millions of dollars of Debtors' reported receivables were not verified by customer information and that one customer had advised that four specific invoices, totaling over $2.6 million, did not exist.

42. In truth, by late September 2025—more than a week before Lender filed its Receivership Motion—Lender had received copies of the four invoices at issue along with a copy of an email by the customer's executive officer saying that the invoices are "legitimate" and explaining that Lender's auditors had contacted two customer employees who did not have access to the customer's "inter-company accounting system" where the invoices were maintained.

3. <u>Debtors' opening of separate bank accounts was to protect Debtors' interests.</u>

43. Finally, the Lender alleged that Debtors' opening of new bank account was designed to convert funds, which is untrue.

44. Lender, through its deposit account control agreement, had begun sweeping all available cash from that account. At the same time, Lender was denying Debtors' properly requested for advances under the Credit Agreement.

45. As a result, Debtors were unable to access the working capital required to purchase materials, pay vendors, or fulfill customer orders—an outcome that directly endangered the ongoing viability of the businesses and, by extension, the value of Lender's collateral.

46. Debtors established a separate bank account to preserve the companies' operations and protect their underlying value. This action was taken to protect those interests by ensuring the continued operation and value of the businesses. No funds were diverted from company accounts, and all funds were used in the operation of the Debtors' business.

## FIRST DAY MOTIONS

47. Debtors have commenced their Chapter 11 Cases in order to protect and maximize their assets. Debtors' transition into their Chapter 11 proceeding must be comprehensively and effectively organized to ensure that it will be able to operate smoothly in bankruptcy. It is

important to minimize the distractions to Debtors' business operations that could result from Debtors petitioning for Chapter 11 relief.

48.  I have reviewed and am generally familiar with the contents of each of the First Day Motions. Based on that familiarity and information supplied to me by other members of Debtors' management and Debtors' various business and legal advisors, I believe that the relief sought in each of the First Day Motions is necessary to enable Debtors to operate in their Chapter 11 Cases with minimal disruption or loss of productivity or value. I also believe that the First Day Motions are vital to Debtors' reorganization efforts and are in the best interests of Debtors and their creditors.

### A.  The Cash Collateral Motion.

49.  On the Petition Date, Debtors had cash in its bank accounts (the "Deposit Accounts") believed to be in the approximate amount[3] of $1,850,000. Other than an account at Wells Fargo, for which Lender holds a deposit account control agreement (for which NMBL has indicated that the Lender had failed to provide the Receiver with possession or control of the account in contravention of the Missouri court order appointing the receiver), the cash was in the possession of or under the control of the NMBL. Debtors have demanded turnover of its accounts from NMBL, but Lender has objected to the demand resulting in Debtors being improperly deprived of estate assets.

50.  Debtors cannot meet their ongoing post-petition obligations unless they have the immediate ability to use the Deposit Accounts, and the cash generated or received by Debtors from and after the Petition Date (the "Post-Petition Cash"). In the absence of such use, immediate and irreparable harm will result to Debtors, their estates, and their creditors, and will render an effective and orderly reorganization of Debtors' businesses impossible.

51.  An integral aspect of maintaining Debtors' business operations is Debtors. ability to use the Deposit Accounts and Post-Petition Cash to maintain a sufficient level of working capital in order to pay ordinary course obligations such as those to its employees, vendors, utilities, taxing

---

[3] Given NMBL's control over the accounts, Debtors do not have access to exact balances therein.

authorities, insurance, and to pay for necessary ordinary business expenses. Debtors also require the use of the Cash Collateral to obtain new supplies to generate additional accounts receivable

52. As exemplified by the Budget, attached hereto as **Exhibit "D,"** Debtors are solely seeking to utilize the Cash Collateral to maintain the value of their businesses, to satisfy their obligations to its customers, and to pay their necessary operating and reorganization expenses. Each expense included within the Budget is a necessary expense to maintain, preserve, and/or continue Debtors' operations, which is the sole means of generating revenue, thereby increasing the value of Debtors' business and providing the resources for Debtors to effectuate their Chapter 11 plan and an expeditious resolution of this Chapter 11 Cases.

53. The use of Cash Collateral necessary to avoid immediate and irreparable harm to Debtors and their bankruptcy estate. Without the authority to use Cash Collateral, Debtors will be forced to cease their operations, thereby eliminating their ability to reorganize. Debtors also believe the Collateral will not diminish in value but rather, the continued operations, will enhance its value.

**B.    The Employee Wage Motion.**

54. Attached hereto as **Exhibit "E"** is a true and correct copy of the *Shared Services Agreement* ("SSA") that the Debtors (and others) entered into with JAL (the "Provider").

55. Attached as **Exhibit "2"** to the Wages Motion is a list of Employees and their related obligations that are the subject of the Wages Motion.

56. Pursuant to the SSA, the Provider employs individuals identified on its books and records and assigns these individuals to provide Services (as that term is defined in the SSA) to each of the Debtors. As of the Petition Date, Debtors together have approximately 220 people working for them on a consolidated basis (herein collectively, the "Employees")[4] in the ordinary course of business. Of the Employees, approximately 54 are paid on salary and 166 are paid hourly. Continued service by the Employees is vital to Debtors' ongoing operations: their skills,

---

[4] Approximately 136 are ColorArt LLC ("ColorArt"); approximately 84 are Las Vegas Color Graphics, Inc. Pursuant to § 2.2(a)(ii) of the SSA, "To the maximum extent permitted by law … all Employees may be deemed to be independent contractors of the Recipients and not employees of any Recipient for any purpose."

knowledge, and understanding of Debtors' operations, customer relations, and infrastructure are essential to the effective reorganization of Debtors.

57. Pursuant to the SSA, the Provider is responsible for, *inter alia*, day-to-day supervision and control of the Employees and for providing working conditions in compliance with applicable law, and, provider pays the compensation of these individuals and provides them with employee benefits and fringe benefits, as well as worker's compensation coverage, and reimbursement of business expenses, all as more fully set forth in § 1.7 of the SSA.

58. Pursuant to the SSA, each of the Debtors reimburse Provider for Direct Employment Costs, which are, collectively, the "Wages, Employment Benefits, Insurance, Termination Benefits and Employee Expenses incurred by Provider pursuant to Section 1.7".

59. Pursuant to the SSA, each of the Debtors also reimburses Provider for Indirect Employment Costs, "which shall mean the Hiring Costs and all other costs incurred by Provider in employing the Employees apart from the Direct Employment Costs, of the types and in the amounts agreed by the Parties. Indirect Employment Costs shall include but need not be limited to premiums for employment practices liability insurance, general liability insurance, automobile insurance, personnel or administrative costs, and other costs incurred by Provider in employing the Employees." *See* SSA § 2.1(b).

60. The Direct Employment Costs and the Indirect Employment Costs (collectively, the "Employment Costs") are apportioned between the Debtors pursuant to § 2.1(c) of the SSA. Additionally, the SSA requires each of the Debtors to pay its own apportioned share of the Employment Costs to the Provider. *See* SSA § 2.1(d).

61. The Employees who perform Services for the Debtors are paid either on salary or an hourly basis and are paid bimonthly, typically on the tenth (10th) and twenty-sixth (26th) of each month, with payroll paid in arrears (the "Wages"). The average gross per period is approximately $600,000 (collectively, the "Wage Obligations"). As of the Petition Date, Debtors believe they have unpaid Wage Obligations that have accrued and remain unpaid, in the amounts of $176,048 for LVCG and $330,939 for ColorArt.

62. Withholding from Wages the amounts related to federal and state income taxes, as well as Social Security and Medicare taxes, and the remitting of the same to the appropriate taxing authorities, is required by law. To the extent funds were deducted from Employees' Wages sufficient to pay prepetition taxes, withholding taxes, and FICA contributions attributed to Wage Obligations which are due but have not yet been paid to any governmental entity (the "Deductions"), Debtors seek authorization to continue to ensure such funds are appropriately deducted and paid to such governmental entities in the ordinary course of business.

63. The Provider is also required to make matching payments from its own funds on account of Social Security and Medicare taxes, and to pay, based on a percentage of gross payroll (and subject to state-imposed limits), additional amounts to the taxing authorities for, among other things, state and federal unemployment insurance (collectively, the "Payroll Taxes"); such amounts are ultimately borne by the Debtors pursuant to the SSA. Debtors therefore seek authorization to continue to cover and remit to the provider all Employment Costs related to Payroll Taxes in the ordinary course of business.

64. In the ordinary course of processing payroll checks for the Employees, the Provider may, from time to time, be required to withhold certain amounts for various garnishments (such as tax levies, child support, and student loans) (collectively, along with any renewals or extensions thereof, the "Garnishments"). As of the Petition Date, Debtors estimate that less than $10,000 in Garnishments have been withheld. Debtors seek a comfort order that any amounts paid to the provider to cover Employment Costs for its Employees that may also be subject to any Garnishments, shall commensurately be authorized to pay over any such Garnishments in the ordinary course of business.

65. As set forth in § 1.7 of the SSA, the Provider, in the ordinary course of business, accrues amounts for contributions (the "Employee Benefit Contributions") to 401(k) retirement plans, health and benefit programs, and voluntary insurance plans (collectively, the "Employee Benefit Plans"), pertaining to services rendered by the Employees prior to the Petition Date. Specifically, the Employee Benefit Plans include, but are not limited to, 401(k) contributions, medical and dental and/or vision benefits, long-term and/or short-term disability insurance, paid

vacation, paid sick leave, and other forms of paid time off. All costs associated with the Employee Benefit Contributions are ultimately borne by the respective Debtor for whom an Employee works. The Employee Benefit Contributions are an integral part of the compensation to which the Employees are entitled. The amount of Employee Benefit Contributions which will have accrued, but will remain unpaid, prior to the Petition Date are estimated to be no more than $173,201.

66. If Debtors are unable to take the necessary steps to ensure that Wage Obligations, and Employee Benefit Contributions are paid for the pay period commencing immediately prior to the Petition Date and concluding post-petition, there is a significant risk that a large number of essential Employees will resign and remaining Employees will be discontented and demoralized, thus negatively affecting a successful reorganization.

67. The Provider also provides workers' compensation benefits to its Employees at the statutorily required levels (the "<u>Workers' Compensation System</u>"), for which any cost is borne by the Debtor for whom the Employee performs Services.

68. If permitted to utilize the cash in their Deposit Accounts and from their Post-Petition Revenues, Debtors will have sufficient liquidity to pay the Employment Costs, which include the costs associated with Wage Obligations, Wages and Deductions, Payroll Taxes, Employee Benefit Contributions, Garnishments, and the Workers' Compensation System.

69. By the Wages Motion, Debtors seek authority to pay and/or honor the Employee-related obligations set forth therein in an effort to (i) maximize the value of the estate by maintaining workplace morale and an essential employment base during this critical time, and (ii) minimize the personal hardship that the Employees will suffer if Debtors cannot honor prepetition employee benefit and other wage-related obligations. The aggregate of Wage Obligations, and Employee Benefit Contributions to be paid to or for the benefit of each of the Employees pursuant to the Wages Motion will not exceed $17,150.00 per Employee, per the cap in Sections 507(a)(4) and (a)(5) of the Bankruptcy Code.

70. Continued payment of Wage Obligations and Employee Benefit Contributions, as well as maintaining Employee Benefit Plans and Workers' Compensation System, are essential to preserve morale and to maintain positive relations between Debtors and Employees. If the relief

requested therein is not granted, the success of Debtors' reorganization will be placed in substantial jeopardy. Thus, the relief requested in the Wages Motion is in the best interests of Debtors' estate, creditors, and parties-in-interest.

71. The amounts requested to be paid through the Wages Motion are necessary for Debtors to maintain operations and do not exceed the statutory cap set forth in Sections 507(a)(4) and (a)(5). Payment of Wage Obligations and Employee Benefit Contributions, as well as maintaining Employee Benefit Plans and Workers' Compensation System, are essential to preserve the morale and to maintain positive relations between Debtors and its Employees.

72. As set forth in the Wages Motion, if the relief requested therein is not immediately granted, Debtors could experience immediate and irreparable harm. Absent the relief requested therein being granted, Debtors could be forced to not operate since Employees will not be paid. Failure to grant the relief requested therein could essentially shut down Debtors, or at a minimum would seriously impede Debtors' operations. Any such significant disruption in operations could put Debtors' reorganization efforts in jeopardy.

73. Bankruptcy Rule 6004(h) provides, "Unless the court orders otherwise, an order authorizing the use, sale, or lease of property (other than cash collateral) is stayed for 14 days after the order is entered." FED. R. BANKR. P. 6004(h). In view of the risk to Debtors' operations in the event Employees are not paid, imposition of a fourteen-day stay on any order granting the Wages Motion is impractical and undermines the nature of the relief requested therein, which relief is necessary to Debtors' reorganization efforts.

### C. The Utility Motion.

74. In the ordinary course of business, Debtors incur utility expenses for electricity, gas, water, internet, telecommunications, and waste services. These utility services are provided by the utilities (as such term is used in Section 366, collectively, the "Utility Providers") including, but not limited to those listed on **Exhibit 3** (the "Utility Service List") to the Utilities Motion.

75. To the extent any of the Utility Providers identified on the Utility Service List provide direct services to a non-Debtor entity or person not subject of the Shared Services

Agreement, Debtors do not anticipate that the Procedures set forth in the Utilities Motion would apply.

76. On average, Debtors spend approximately $158,348.37 each month on utilities costs. As of the Petition Date, Debtors believe that they are substantially current on payments to Utility Providers that came due on or before the Petition Date.

77. To calculate the approximate monthly expenditure for utilities costs, Debtors determined an average cost per month based on actual costs over a preceding six-month period.

78. Preserving utility services on an uninterrupted basis is essential to Debtors' ongoing operations and, therefore, to the success of the Chapter 11 Cases. Any interruption of utility services, even for a brief period of time, would disrupt Debtors' ability to continue operating, thereby negatively affecting revenue. Such a result could jeopardize Debtors' reorganization efforts and, ultimately, the value of Debtors' assets. It is therefore critical that utility services continue uninterrupted during the Chapter 11 Cases.

79. Debtors intend to pay all valid post-petition obligations owed to the Utility Providers in a timely manner. If permitted to utilize the cash in their Deposit Accounts and from their Post-Petition Revenues, Debtors have sufficient funds to pay post-petition obligations to Utility Providers. Thus, Debtors will have the ability to pay post-petition obligations to Utility Providers.

80. Moreover, the aggregate amount of Debtors' utility obligations is not overwhelming, and Debtors were generally current with the Utility Providers as of the Petition Date.

81. In addition, Debtors have a powerful incentive to stay current on utility obligations because of their reliance on utility services for business operations.

82. The proposed Procedures set forth in the Utilities Motion are necessary for Debtors to carry out their reorganization efforts in the Chapter 11 Cases. If the Procedures are not approved, Debtors could be forced to simultaneously address several requests by multiple Utility Providers in a less-than-organized manner during the critical first weeks of their Chapter 11 reorganization. Moreover, Debtors could be blindsided by a Utility Provider unilaterally deciding that it is not adequately protected and discontinuing service or making an exorbitant demand for

payment to continue service. Discontinuation of utility service could essentially shut down Debtors, or at a minimum would seriously impede Debtors' operations, and such significant disruptions in operations could put Debtors' reorganization efforts in jeopardy.

83. If the relief requested in the Utilities Motion is not immediately granted, Debtors could experience immediate and irreparable harm. Absent the Utilities Motion relief requested being granted, Debtors could be forced to simultaneously address several requests by multiple Utility Providers in a less-than-organized manner during the critical first weeks of their Chapter 11 reorganization. Moreover, Debtors could be blindsided by a Utility Provider unilaterally deciding that it is not adequately protected and discontinuing service or making an exorbitant demand for payment to continue service. Discontinuation of utility service could essentially shut down Debtors, or at a minimum would seriously impede Debtors' operations. Any such significant disruption in operations could put Debtors' reorganization efforts in jeopardy.

I declare under penalty of perjury of the laws of the United States that these facts are true to the best of my knowledge and belief.

DATED this 7th day of November 2025.

By: _____
ERAN SALU