# EXHIBIT E

# EXHIBIT E

## SHARED SERVICES AGREEMENT

**THIS SHARED SERVICES AGREEMENT** *("Agreement')* is made effective as of January 1, 2025 (the *"Effective Date"),* by and among JAL Equity Corp, a Nevada corporation *("Provider"),* and the entities identified on **Exhibit A** hereto, as the same may be amended from time to time (each a *"Recipient"* and collectively, the *"Recipients").* Provider and Recipients are sometimes herein referred to collectively as "Parties" and individually as a "Party."

Each of the Recipients is a direct or indirect subsidiary of Provider. The Parties desire that Provider employ certain individuals and make their Services (as defined below) available to the Recipients pursuant to the terms and subject to the conditions set forth in this Agreement.

**NOW THEREFORE,** in consideration of the mutual promises, covenants and agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.      **EMPLOYMENT OF THE EMPLOYEES.**

      **1.1      Employment.** Subject to Sections 1.2 and 1.3 below, Provider may employ the individuals identified on the books and records of Provider (as modified from time to time as provided herein, the *"Employees")* during the Term (defined below) and may assign them to provide Services to one or more of the Recipients as provided in Section 1.4 below.

      **1.2      Termination.** Provider may terminate any Employee at any time, with or without reason or cause. Employees terminated by Provider shall cease to be Employees as of the effective date of termination. Employees who resign or die shall cease to be Employees as of the effective date of resignation or the date of death (as applicable). The Parties shall communicate with each other reasonably regarding the termination of an Employee.

      **1.3      Hiring.** Provider may recruit and hire new individuals as Employees from time to time, as may be agreed by Provider and one or more of the Recipients. Any individual so hired shall be treated as an Employee hereunder as of the effective date of his or her employment. The costs associated with such recruiting and hiring *("Hiring Costs")* shall be Indirect Employment Costs pursuant to Section 2.1(b).

      **1.4      Assignment.** From time to time, Provider may assign Employees to provide Services to one or more of the Recipients, as Provider and the Recipients may agree.

      **1.5      Records.** Provider shall create and maintain personnel and payroll records for Employees, including records of hours worked, as required by applicable law.

      **1.6      Supervision and Control; Working Conditions.** Provider shall be responsible for the day-to-day supervision and control of the Employees and for providing working conditions that comply with all applicable laws, including laws regarding employment discrimination, harassment, retaliation, occupational safety and health, wages and hours, meal periods, rest breaks, leaves of absence and other time off. Provider may determine the proper classification of Employees under the Fair Labor Standards Act and analogous state and federal laws.

      1.7      **Compensation and Benefits.** Subject to the other provisions of this Agreement, including Section 2.1 hereof:

1

(a)    **Wages.** Provider shall timely pay (in accordance with its customary payroll practices) all Wages, at the rates agreed by the Parties (but in no event less than the wages required by applicable law). For purposes of this Section 1.7(a), *"Wages"* shall mean all cash payments to Employees for Services rendered as Employees during the Term, including but not limited to base salary or base hourly wage rate, any shift differential, overtime compensation or other forms of premium pay, any annual incentive or other bonus payments, sick pay, holiday pay and other paid time off (including but not limited to vacation) in each case to the extent that such costs are actually incurred by Provider during the Term, together with all associated federal, state and local payroll taxes and social security and Medicare taxes.

(b)    **Employment Benefits.** Provider shall provide employment benefits and fringe benefits to the Employees of the types and in the amounts agreed by the Parties (but in no event less than the benefits required by applicable law) *("Employment Benefits")*. Employment Benefits may include, but need not be limited to, health, dental and/or vision insurance coverage, short-term and/or long-term disability insurance coverage, participation in a 401(k), paid vacation, paid sick leave and other forms of paid time off.

(c)    **Insurance.** Provider shall provide workers' compensation coverage to the Employees in the amounts agreed by the Parties (but in no event less than the amounts required by applicable law) and other insurance coverages of the types and in the amounts agreed by the Parties, which may include, but need not be limited to, sickness and accident insurance and accidental death and disability insurance *("Insurance")*.

(d)    **Termination Benefits.** Upon the termination of any Employee's employment during or at the end of the Term, Provider shall provide all termination benefits due and owing to such Employee pursuant to contract or applicable law *("Termination Benefits"),* which may include but are not limited to severance benefits, pay in lieu of notice, payment for accrued but unused vacation, and liabilities under the Worker Adjustment and Retraining Notification Act (29 U.S.C. §2101 et seq.) or any analogous state or local law.

(e)    **Employee Expenses.** Provider shall reimburse all business expenses reasonably incurred by Employees in connection with their Employment *("Employee Expenses"),* in accordance with applicable law and Provider's policies and practices regarding reimbursement of expenses.

2.    **THE PARTIES.**

   2.1    **Payment by the Recipients.**

(a)    The Recipients shall reimburse Provider for all *"Direct Employment Costs,"* which shall mean the cost of the Wages, Employment Benefits, Insurance, Termination Benefits and Employee Expenses incurred by Provider pursuant to Section 1.7.

(b)    The Recipients shall also reimburse Provider for all *"Indirect Employment Costs,"* which shall mean the Hiring Costs and all other costs incurred by Provider in employing the Employees apart from the Direct Employment Costs, of the types and in the amounts agreed by the Parties. Indirect Employment Costs shall include but need not be limited to premiums for employment practices liability insurance, general liability insurance, automobile insurance, personnel or administrative costs, and other costs incurred by Provider in employing the Employees.

(c)     The Direct Employment Costs and the Indirect Employment Costs (together, the **"Employment Costs")** may be apportioned between and among the Recipients as the Parties may agree from time to time.

(d)     The Recipients shall pay their apportioned share of the Employment Costs to Provider in such manner and at such times as the Parties may agree. For the avoidance of doubt, the Recipients shall reimburse Provider for all Employment Costs incurred by Provider during or at the end of the Term, even if such Costs are paid after the Term (such as Wages for the final pay period of the Term that are paid after the Term or severance payments that continue past the end of the Term).

2.2     **Relationship of the Parties.**

(a)     To the maximum extent permitted by law, (i) Provider may be deemed to be the sole employer of the Employees for all purposes, and (ii) all Employees may be deemed to be independent contractors of the Recipients and not employees of any Recipient for any purpose. All employees of a Party who are not Employees may be deemed for all purposes, including compensation and employee benefits, to be employees or agents solely of such Party and not to be employees or agents of the other Party for any purpose.

(b)     The Parties are and shall be independent contractors with respect to each other. No partnership, joint venture, alliance, fiduciary or any relationship other than that of independent contractors is created hereby, expressly or by implication.

2.3     **Use of Information; Confidentiality.** Each Party shall, and shall cause its directors, officers, managers, employees and agents to, hold in strict confidence the confidential or proprietary information of each other Party (the **"Owning Party"),** using the same degree of care that it normally uses to protect its own confidential or proprietary information, unless compelled by law to disclose such information, in which event such legally-compelled Party shall provide the Owning Party with prior written notice of such legal compulsion and may use its reasonable commercial efforts to afford the Owning Party a reasonable period of time to contest such disclosure, including obtaining a protective order or other appropriate remedy. Confidential or proprietary information does not include, and there may be no obligation with respect to, information that (a) is generally available to the public on the date of this Agreement, or (b) becomes generally available to the public other than as a result of a disclosure in violation of this Agreement.

2.4     **Use of Non-Parties.** Each Party may use non-Parties to satisfy obligations under this Agreement, including the Party's direct or indirect parent, subsidiary or affiliated entities, but shall remain at all times responsible for compliance with this Agreement.

3.     **TERM AND TERMINATION; ADDITION OF RECIPIENTS; TERMINATION OF RECIPIENTS.**

3.1     **Term and Termination.** This Agreement shall become effective on the Effective Date and shall continue in effect until terminated by written agreement of the Parties.

3.2     **Addition of Recipients.** With the consent of Provider, any direct or indirect parent, subsidiary or affiliated entity of Provider may become a Recipient and a Party to this Agreement by executing a counterpart to **Exhibit A.**

**3.3** **Termination of Recipients.** This Agreement may be terminated as to a particular Recipient (the *"Terminating Recipient"),* and such Recipient shall cease to be a Recipient or a Party and shall be deemed to be removed from **Exhibit A:**

(a) by written agreement of all Parties;

(b) by Provider or the Terminating Recipient upon thirty (30) days' written notice to all other Parties; or

(c) immediately upon written notice by any Party to all other Parties terminating this Agreement as to the Terminating Recipient due to (i) the felony conviction (including plea of guilty or no-contest to a felony charge) of the Terminating Recipient or any director, officer or managing agent of the Terminating Recipient, or (ii) the bankruptcy or insolvency of the Terminating Recipient.

**4.** **LIABILITY.**

**4.1** **Compliance with Law.** Each Party shall perform its obligations hereunder in compliance with all applicable laws.

**4.2** **Indemnification by Provider.** Provider hereby agrees to indemnify and hold harmless each Recipient and such Recipient's Affiliates other than the Provider (collectively, the *"Recipient Parties")* from and against any and all Losses that may accrue to or be sustained by any of the Recipient Parties during or relating to the Term (whether asserted during or after the Term) on account of any claim, demand, charge, suit, action, investigation or proceeding made or brought against any of the Recipient Parties by any person or entity related to or arising from (a) Provider's failure to comply with any of its obligations under this Agreement, or (b) any negligence or intentional misconduct of Provider or any Employee. For the avoidance of doubt, Employees shall be deemed to be the employees of Provider, and not employees of the Recipients, for purposes of this Section 4.

**4.3** **Indemnification by Recipient.** Each Recipient (the *"Indemnifying Recipient")* hereby agrees to indemnify and hold harmless Provider and its Affiliates other than the Indemnifying Recipient (collectively, the *"Provider Parties")* from and against any and all Losses that may accrue to or be sustained by any of the Provider Parties during or relating to the Term (whether asserted during or after the Term) on account of any claim, demand, charge, suit, action, investigation or proceeding made or brought against any of the Provider Parties by any person or entity related to or arising from (a) the Indemnifying Recipient's failure to comply with any of its obligations under this Agreement, or (b) any negligence or intentional misconduct of the Indemnifying Recipient; provided, however, that the Indemnifying Recipient may not be obligated to provide indemnification against any Losses to the extent that Provider is obligated to provide indemnification against such Losses pursuant to Section 4.2.

**4.4** **Definitions.** As used in this Agreement: (a) *"Affiliates"* of a Party shall mean such Party's direct and indirect parent, subsidiary and affiliated entities, and their respective successors and assigns, and all of their respective shareholders, members, partners, directors, officers, managers, employees and agents; and (b) *"Losses"* shall mean any and all liabilities, damages, costs, compensation, losses, expenses, fines, penalties and attorneys' fees of any kind.

**4.5** **Limitation of Liability.** Without limiting any Party's indemnification obligations

(including to the extent any Losses are required to be paid to a third party), no Party shall have any liability for special or punitive damages incurred by any other Party or any of such other Party's Affiliates or any third party (even if any such Party has been advised of the possibility of such damages), whether based on contract, tort or any legal theory, arising out of or related to this Agreement or the transactions contemplated herein.

5.      **SERVICES.** Provider may provide the following services to Recipients during the Term ("Services"):

   5.1    **Accounting and Finance.**

      5.1.1      **GL/ERP Services**, consisting of general ledger/Enterprise Resource Planning implementation and management.

      5.1.2      **External Audit Management Services**, consisting of coordinating and overseeing interactions with independent third party auditors.

      5.1.3      **Accounts Receivable ("A/R") and A/R Support and Management Services**, consisting of managing money owed by customers (including but not limited to bookkeeping, invoice generation and distribution, credit control and payment collection) and overseeing all incoming payments from customers to ensure timely and consistent conversion of sales into cash.

      5.1.4      **Cash Management and other Treasury Services**, consisting of:

         5.1.4.1 **Credit Services**, consisting of management of credit department (people, processes, policies), credit approvals and risk analysis.

         5.1.4.2 **Cash Management Services**, consisting of management of treasury department (people, processes, policies), daily cash management (making of payments [via check, wires, ACH], cash position, funding accounts, etc.), sole control of and dominion over all Recipient bank accounts and account structure; and cash forecasting and tracking.

         5.1.4.3 **Treasury Operations Services**, consisting of preparation and submission of debt compliance certificates, borrowing base and interest and fee payments, credit card administration and support including internal and external audits, and management and maintenance of bank relations.

         5.1.4.4 **Supplier Credit Services**, consisting of credit support for existing and new suppliers, including negotiation and preparation of agreements, obtaining credit, and credit applications, administration of supplier credit risk including reporting and tracking of activity, and management of letters of credit and prepayments.

         5.1.4.5 **Capital Structure Services**, consisting of capital structure management, including debt, lease financing, equity and working capital, investor relations support, evaluation and support relating to refinancing, offerings and other debt and capital activities, and support for business development including due diligence relating to treasury/finance for mergers and acquisitions.

**5.1.4.6 Other Accounting and Finance Services** as may be agreed upon and directed by the Parties.

**5.2    Compliance**

**5.2.1    Insurance-Related Services**, consisting of property and liability insurance program establishment and administration (with a focus on risk management).

**5.2.2    Entity Management Services**, consisting of corporate data tracking and handling corporate compliance matters including but not limited to filing annual reports and managing service of process.

**5.2.3    Tax Services**, consisting of fulfilling all federal, state, and local tax-related legal obligations, including but not limited to preparing and submitting tax returns.

**5.2.4    Real Estate Services**, consisting of day-to-day real property management and lease administration.

**5.2.5    Other Compliance Services** as may be agreed upon and directed by the Parties.

**5.3    Information Technology**

**5.3.1    Computer Network Management, Maintenance, and Support Services**, consisting of performance monitoring, network optimization and configuration, hardware and software installation, application of security updates, data retention and backup, help desk support, and issue troubleshooting.

**5.3.2    Telephony Management Services**, consisting of overseeing landline, mobile, and Voice over Internet Protocol (VoIP) communications.

**5.3.3    Project Management Services**, consisting of planning, executing, and monitoring technology-related projects to ensure timely completion, budget compliance, and quality standards.

A Recipient may discontinue any Service or Services provided hereunder at any time for any or no reason.  Such action shall not constitute a beach of this Agreement.

Provider may from time to time charge a management fee for provision of the Services at an amount mutually agreed upon orally or in writing by the Parties.

**6.    ADDITIONAL PROVISIONS.**

**6.1    Assignment.** This Agreement may not be assigned or transferred by any Party (whether by operation of law or otherwise) without the prior written consent of the other Parties. Any such assignment, transfer, delegation or subcontract by any Party without such consent in violation hereof will be null and void.

**6.2    Entire Agreement; Binding Effect.** This Agreement constitutes the entire agreement between and among the Parties regarding the subject matter hereof and supersedes any and all other prior agreements and undertakings, both written and oral, among the Parties with respect to the subject matter hereof, including but not limited to that certain Shared Services Agreement between Provider and certain Recipients dated effective January 1, 2024, and does not, and is not intended to, confer upon any third party any rights or remedies hereunder. This Agreement and the rights and licenses granted herein will be binding upon the Parties and their successors and permitted assigns.

**6.3    Severability.** If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this Agreement will nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon a determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties will negotiate in good faith to modify this Agreement so as to affect their original intent as closely as possible such that the transactions contemplated hereby are fulfilled to the maximum extent possible.

**6.4    Waiver; Amendment.** No waiver by any Party of any default in performance by any other Party hereunder (including as a result of any failure to enforce any of the terms or conditions of this Agreement), or of any breach or series of breaches by any other Party of any provision herein constitutes a waiver of any subsequent default in performance under this Agreement or any subsequent breach of any provision thereof. All waivers under this Agreement may be in writing. This Agreement may be amended only by a writing executed by the Parties.

**6.5    Choice of Law; Venue.** This Agreement will be governed by and construed in accordance with the laws in effect in the State of Missouri, without regard to any applicable principles of conflicts of laws. Any action or proceeding arising from or relating to this Agreement must be brought exclusively in a state or federal court in St. Louis County, Missouri (or any court having jurisdiction over the state or federal courts located in St. Louis County, Missouri), and each Party irrevocably submits to the jurisdiction and venue of such courts.

**6.6    Notice.** All notices, requests and other communications hereunder will be in writing and in each case to the respective address for each Party on file with the other Parties or to such other person or address as any Party may specify by notice in writing to the other Parties hereto. Except for a notice of a change of address, which will be effective only upon receipt thereof, all such notices, requests, requests and other communications properly addressed will be deemed given and effective: (a) if sent by U.S. mail (or if internationally, by air mail); (b) if sent by Federal Express or other overnight delivery service; (c) if sent by personal courier; and (d) if sent by email to the latest known email address of the other Parties.

**6.7    Counterparts.** This Agreement may be executed simultaneously in one or more counterparts (including by .pdf submission), each of which when executed will be deemed to be an original, but all of which will constitute one and the same agreement.

**6.8    Additional Recipients.** Other entities may be added as Recipients to this Agreement upon execution of a joinder agreement in a form approved by Provider.  Such additions shall be accomplished without the approval of the existing Recipients in each case.

**IN WITNESS WHEREOF,** the Parties have executed this Agreement to be effective as of the Effective Date .

FOR PROVIDER:                                          FOR THE RECIPIENTS:

**JAL Equity Corp**                                      **As shown on Exhibit A hereto**

Signed: _____
Name:  Eran Salu
Title:   President

**EXHIBIT A:**

**RECIPIENTS**

| | |
|---|---|
| **Recipient Name:**<br><br>**Action Printing, LLC**<br><br>Signed: _____<br><br>Name:  Eran Salu<br><br>Title:   President<br><br>Date:   January 1, 2025 | **Recipient Name:**<br><br>**Balmar, LLC**<br><br>Signed: _____<br><br>Name:  Eran Salu<br><br>Title:   President<br><br>Date:   January 1, 2025 |
| **Recipient Name:**<br><br>**Bass Company, LLC**<br><br>Signed: _____<br><br>Name:  Eran Salu<br><br>Title:   President<br><br>Date:   January 1, 2025 | **Recipient Name:**<br><br>**Brant Instore Limited**<br><br>Signed: _____<br><br>Name:  Eran Salu<br><br>Title:   President<br><br>Date:   January 1, 2025 |
| **Recipient Name:**<br><br>**Business Leader**<br><br>Signed: _____<br><br>Name:  Eran Salu<br><br>Title:   President<br><br>Date:   January 1, 2025 | **Recipient Name:**<br><br>**ColorArt LLC**<br><br>Signed: _____<br><br>Name:   Eran Salu<br><br>Title:   President<br><br>Date:   January 1, 2025 |

**Recipient Name:**

**Desert Paper and Envelope Company, Inc.**

Signed: _____

Name:  Eran Salu

Title:    President

Date:    January 1, 2025

**Recipient Name:**

**Executive Mailing Services, LLC**

Signed: _____

Name:  Eran Salu

Title:    President

Date:    January 1, 2025

**Recipient Name:**

**Fisher, Incorporated**

Signed: _____

Name:  Eran Salu

Title:    President

Date:     January 1, 2025

**Recipient Name:**

**Frye-Williamson Press, Inc.**

Signed: _____

Name:  Eran Salu

Title:    President

Date:    January 1, 2025

**Recipient Name:**

**Garage Graphics& Visuals, Inc.**

Signed: _____

Name:  Eran Salu

Title:    President

Date:    January 1, 2025

**Recipient Name:**

**Gibson & Dehn, LLC**

Signed: _____

Name:  Eran Salu

Title:    President

Date:    January 1, 2025

**Recipient Name:**

**Graphic Arts, Incorporated**

Signed: _____

Name:  Eran Salu

Title:    President

Date:    January 1, 2025

**Recipient Name:**

**HBP Marketing, LLC**

Signed: _____

Name:  Eran Salu

Title:    President

Date:    January 1, 2025

**Recipient Name:**

**Horizon Fulfillment, LLC**

Signed: _____

Name:  Eran Salu

Title:    President

Date:    January 1, 2025

**Recipient Name:**

**Husky Envelope, LLC**

Signed: _____

Name:  Eran Salu

Title:    President

Date:    January 1, 2025

**Recipient Name:**

**Kappa Graphics, LLC**

Signed: _____

Name:  Eran Salu

Title:    President

Date:    January 1, 2025

**Recipient Name:**

**Kappa Product Fulfillment Services, LLC**

Signed: _____

Name:  Eran Salu

Title:    President

Date:    January 1, 2025

**Recipient Name:**

**Knepper Press Corporation**

Signed: _____

Name:  Eran Salu

Title:    President

Date:    January 1, 2025

**Recipient Name:**

**Kubin-Nicholson Corporation**

Signed: _____

Name:  Eran Salu

Title:    President

Date:     January 1, 2025

**Recipient Name:**

**Marketing.com, LLC**

Signed: _____

Name:  Eran Salu

Title:    President

Date:    January 1, 2025

**Recipient Name:**

**KPC-NY, LLC**

Signed: _____

Name:  Eran Salu

Title:    President

Date:    January 1, 2025

**Recipient Name:**

**Las Vegas Color Graphics, Inc.**

Signed: _____

Name:  Eran Salu

Title:    President

Date:    January 1, 2025

**Recipient Name:**

**Marketing.com Holdings, LLC**

Signed: _____

Name:  Eran Salu

Title:    President

Date:    January 1, 2025

**Recipient Name:**

**Mossberg & Company LLC**

Signed: _____

Name:  Eran Salu

Title:    President

Date:    January 1, 2025

**Recipient Name:**

**Prolist, LLC**

Signed: _____

Name:  Eran Salu

Title:    President

Date:    January 1, 2025

**Recipient Name:**

**Reprocomm, Inc.**

Signed: _____

Name:  Eran Salu

Title:    President

Date:    January 1, 2025

**Recipient Name:**

**NPC LLC**

Signed: _____

Name:  Eran Salu

Title:    President

Date:    January 1, 2025

**Recipient Name:**

**Regency Typographic Services, Inc.**

Signed: _____

Name:  Eran Salu

Title:    President

Date:    January 1, 2025

**Recipient Name:**

**Response Envelope, Inc.**

Signed: _____

Name:  Eran Salu

Title:    President

Date:    January 1, 2025

**Recipient Name:**

**Smith-Edwards-Dunlap Company**

Signed: _____

Name:  Eran Salu

Title:    President

Date:    January 1, 2025


**Recipient Name:**

**Stratis Printing, LLC**

Signed: _____

Name:  Eran Salu

Title:    President

Date:    January 1, 2025


**Recipient Name:**

**Wings Company, LLC**

Signed: _____

Name:  Eran Salu

Title:    President

Date:    January 1, 2025


**Recipient Name:**

**Southland Envelope LLC**

Signed: _____

Name:  Eran Salu

Title:    President

Date:    January 1, 2025


**Recipient Name:**

**Stratis Real Estate, LLC**

Signed: _____

Name:  Eran Salu

Title:    President

Date:    January 1, 2025