Samuel A. Schwartz, Esq.
Nevada Bar No. 10985
saschwartz@nvfirm.com
Gabrielle A. Hamm, Esq.
Nevada Bar No. 11588
ghamm@nvfirm.com
Athanasios Agelakopoulos, Esq.
Nevada Bar No. 14339
aagelakopoulos@nvfirm.com
SCHWARTZ LAW, PLLC
601 East Bridger Avenue
Las Vegas, Nevada 89101
Telephone: (702) 385-5544
Facsimile: (702) 442-9887

    *and*

Kenneth J. Ottaviano (*pro hac vice* forthcoming)
William J. Dorsey (*pro hac vice* forthcoming)
Stephanie K. Hor-Chen (*pro hac vice* forthcoming)
BLANK ROME LLP
444 West Lake Street, Suite 1650
Chicago, IL 60606
Telephone: (312) 776-2514
ken.ottaviano@blankrome.com
william.dorsey@blankrome.com
stephanie.horchen@blankrome.com

*Counsel for Aequum Capital Financial II LLC*

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| In re: | Case No.: 25-16701-NMC |
| COLORART, LLC, | Chapter 11 |
| Debtor. | (Joint Administration Requested) |
| | **OBJECTION AND RESERVATION OF RIGHTS OF AEQUUM CAPITAL FINANCIAL II LLC TO DEBTORS' EMERGENCY MOTION PURSUANT TO 11 U.S.C. §§ 105, 361, 363, AND 506, AND FED. R. BANKR. P. 4001(b) FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING THE USE OF CASH COLLATERAL AND SCHEDULING A FINAL HEARING** |
| | Date:    November 13, 2025 |
| | Time:    11:30 AM |

## <u>Table of Contents</u>

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ................................................................................................................... 3

    A.    The Credit Facility ................................................................................ 3

    B.    Debtors' Defaults Under the Credit Agreement ........................................ 4

    C.    The Appointment of the Receiver and Debtors' Continued Lack of Cooperation ....................................................................................... 11

    D.    Debtors' Chapter 11 Filing and the Cash Collateral Motion. ................... 13

ARGUMENT ...................................................................................................................... 14

    A.    Debtors May Not Use Lender's Cash Collateral Without Its Consent Unless They Meet Their Burden of Showing that Lender is Adequately Protected. ........ 14

    B.    Debtors Have Not Established that Lender is Adequately Protected and Debtors Should be Prohibited from Using Cash Collateral. ................................. 17

    C.    Lender Should be Afforded Meaningful Adequate Protection in this Case. ........ 20

RESERVATION OF RIGHTS ................................................................................................. 22

## <u>Table of Authorities</u>

**Statutes**

11 U.S.C. § 361 ............................................................................................................ *passim*

11 U.S.C. § 363 ............................................................................................................ *passim*

**Cases**

*Bluebird Partners, L.P. v. First Fid. Bank*, 896 F. Supp. 152, 154 (S.D.N.Y. 1995) .................. 15

*Chrysler Credit Corp v. Ruggiere (In re George Ruggiere Chrysler-Plymouth, Inc.)*,
    727 F.2d 1017 (11th Cir. 1984) .................................................................................. 16

*First Bank of Miller v. Wieseler*, 45 B.R. 871, 876 (D.S.D. 1985) .................................... 17

*Hari Ram, Inc. v. Magnolia Portfolio, LLC (In re Hari Ram, Inc.)* .................................... 17

*In re Am. Mariner Indus., Inc*., 734 F.2d 426, 432 (9th Cir. 1984) .................................... 15

*In re Berens*, 41 B.R. 524, 527 (Bankr. D. Minn. 1984) ............................................ 16, 17

*In re Blehm Land and Cattle Co.*, 859 F.2d 137 (10th Cir. 1988) .................................... 17

*In re Carbone Cos., Inc.*, 395 B.R. 631, 635 (Bankr. N.D. Ohio 2008) ............................ 17

*In re Delco Oil, Inc*., 599 F.3d 1255, 1260–61 (11th Cir. 2010) ...................................... 4

*In re Delco Oil, Inc.,* M.D. Fla. Bankr., Case No. 3:06-bk-03241-PMG, D.I. 91 ................ 20

*In re Dunes Casino Hotel*, 69 B.R. 784, 793 (Bankr. D.N.J. 1986) .................................... 15

*In re Dynaco Corp.*, 162 B.R. 389 (Bankr. D.N.H. 1993) ............................................ 16

*In re Earth-Lite, Inc.*, 9 B.R. 440, 443 (Bankr. M.D. Fla. 1981) .................................... 16

*In re Geijsel,* 480 B.R. 238, 267 (Bankr. N.D. Tex. 2012) ............................................ 15

*In re Goode*, 235 B.R. 584, 590 (Bankr. E.D. Tenn. 1999) ............................................ 18

*In re Goode*, 235 B.R. 584, 590 (Bankr. E.D.Tex. 1999) ............................................ 20

*In re GVM, Inc.*, 605 B.R. 315, 325 (Bankr. M.D. Pa. 2019) ........................................ 18

*In re Las Vegas Monorail Co.*, 429 B.R. 317, 326 (Bankr. D. Nev. 2010) ........................ 15

*In re LightStyles, Ltd.*, No. 1:12-BK-03711 MDF, 2012 WL 3115902, at *3–4
    (Bankr. M.D. Pa. July 27, 2012) .............................................................................. 17

*In re LightStyles, Ltd.*, No. 1:12-BK-03711 MDF, 2012 WL 3115902, at *4
    (Bankr. M.D. Pa. July 27, 2012) .............................................................................. 18

*In re McCutchen*, 115 B.R. 126, 133 (Bankr. W.D. Tenn. 1990) .................................... 18

*In re Metromedia Fiber Network, Inc.*, 290 B.R. 487, 491 (Bankr. S.D.N.Y. 2003) .......... 16

*In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987) ............................................ 15

*In re Ohannes Karamoussayan*, 656 B.R. 652 (1st BAP, 2024) ........................................ 20

*In re Sharon Steel Corp.,* 159 B.R. 165, 169 (Bankr. W.D. Pa. 1993) ............................ 15

*In re Swedeland Dev. Group*, 16 F.3d 552, 564 (3d Cir. 1994) .................................... 17

*In re Timbers of Inwood Forest Assocs., Ltd.*, 793 F.2d 1380, 1396 (5th Cir. 1986) .......... 15

*In re Torres Dev., L.L.C.*, 413 B.R. 687, 695 (Bankr. S.D. Tex. 2009) ........................................ 17

*In re Visicon Shareholders Trust*, 478 B.R. 292, 314 (Bankr. S.D. Ohio 2012) .......................... 20

*In re Worldcom, Inc.*, 304 B.R. 611, 618 (Bankr. S.D.N.Y. 2004) ............................................. 16

*Pursuit Athletic Footwear*, 193 B.R. at 716 ............................................................................. 18

*Roach Automotive, L.P. d/b/a West Pointe Chrysler Dodge v. Daimler Chrysler Fin. Servs. Am., LLC (In re Roach Auto., L.P.)*, 540 B.R. 146, 151 (Bankr. W.D. Pa. 2007) ............................ 17

*Save Power Ltd v. Pursuit Athletic Footwear, Inc. (In re Pursuit Athletic Footwear, Inc.)*, 193 B.R. 713, 716 (Bankr. D. Del. 1996) ............................................................................... 17

*Security Leasing Partners, LP v. ProAlert, LLC (In re ProAlert, LLC)*, 314 B.R. 436, 441 (9th Cir. BAP 2004) ............................................................................... 15

*United States v. Whiting Pools, Inc.*, 462 U.S. 198, 207 (1983) ................................................. 15

**Other Authorities**

3 COLLIER ON BANKRUPTCY ¶ 363.05 (16th ed. 2023) ............................................................. 14

3 COLLIER ON BANKRUPTCY ¶ 363.05 (3d ed. rev. 2005) ..................................................... 14, 17

H.R. REP. NO. 595, 95th Cong., 1st Sess. 339 (1977) .............................................................. 17

Aequum Capital Financial II LLC ("Aequum") in its capacity as senior secured lender (in such capacity, "Lender"), by and through its attorneys, Blank Rome LLP and Schwartz Law, PLLC, respectfully submits this Objection (this "Objection") to *Debtors' Emergency Motion Pursuant to 11 U.S.C. §§ 105, 361, 363, and 506, and Fed. R. Bankr. P. 4001(B) for Entry of Interim and Final Orders Authorizing the Use of Cash Collateral and Scheduling a Final Hearing* (the "Cash Collateral Motion") filed by the above-captioned debtors and debtors-in-possession (collectively, "Debtors"). In support of this Objection, Lender respectfully submits the Declaration of Eugene Ruggles (the "Lender Dec."), the Declaration of Attorney William J. Dorsey (the "Dorsey Dec."), and the exhibits annexed thereto, and represents as follows[1]:

## **PRELIMINARY STATEMENT**

1.    Debtors filed the instant bankruptcy petition after being caught converting at least $5.2 million of Aequum's cash collateral, and following the entry of an order appointing a receiver to run their business, an order they brazenly flouted.  This is a quintessential bad faith filing and a trustee should be appointed.   In the meantime, Debtors' request for use of Lender's Cash Collateral—even on an interim basis—must be denied for the reasons set forth below and in the Lender Cash Collateral Motion (as defined below). Under Section 363(c) of the Bankruptcy Code, a secured creditor is entitled to adequate protection to prevent diminution of its collateral.  Debtors' rampant conversion of Lender's Cash Collateral, abject refusal to provide information about the business and its employees,  repeated misrepresentations, and brazen violation of prior court orders make clear that Debtors cannot be trusted with whatever remains of this business and Lender cannot be adequately protected.

2.    As also set forth in the Lender Cash Collateral Motion, these Chapter 11 Cases are the epitome of a bad faith filing by Debtors' principal, Eran Salu ("Salu"), and part of an ongoing fraudulent scheme to convert Lender's Cash Collateral.  Salu filed these bankruptcy cases following a Missouri court's appointment of a receiver to manage Debtors after ***Salu admitted under oath, on the stand, diverting $5.2 million in cash from Debtors' controlled account.*** Despite repeated

---

[1] Lender also understands that the Receiver (as defined below) intends to file a supplemental declaration in connection with this Cash Collateral Motion.

1    demands, Debtors have refused to cooperate with either Lender or the court-appointed receiver to

2    identify employees, produce accounts receivable aging reports or other basic financial records, or

3    even substantiate that Debtors continue to conduct any business operations whatsoever.  This

4    pattern of obstruction underscores that Debtors' bankruptcy filings are not in good faith, and they

5    should not be permitted to use Lender's cash collateral under any circumstances.  Debtors' one-

6    page budget—proffered in support of the Cash Collateral Motion without a single supporting

7    financial statement, invoice, or contract—underscores Debtors' continued obfuscation.

8        3.    Lender is the senior secured lender to Debtors and is currently owed in excess of

9    $26 million on a defaulted loan. Prior to the Petition Date, in addition to myriad payment, reporting,

10   and covenant defaults, Lender learned that Debtors had engaged in a scheme to vastly overstate the

11   value of the collateral which serves as the borrowing base for this asset-based loan, locked Lender

12   out of any ability to independently verify the value and extent of its collateral, and have ***admitted***

13   that Debtors, under Salu's direction, diverted at least $5.2 million. When Lender learned of the

14   diversion, it filed a receivership action in Missouri, where ColorArt is headquartered.  The Missouri

15   court agreed that a receivership over Debtors was warranted and appointed NMBL Strategies to

16   oversee operations in an order dated October 29, 2025.  Rather than comply with that order, Salu

17   and Debtors refused to provide information to the receiver or turn over basic financial records—in

18   brazen breach of the receivership order.  This bankruptcy filing ensued.

19       4.    The proposed use of Cash Collateral will materially and adversely impact Lender's

20   overall collateral position.  Debtors have admitted to the repeated diversion and misuse of Lender's

21   collateral, demonstrating that Lender's collateral has already been improperly dissipated.  Coupled

22   with the total lack of transparency, inadequate budget and financial projections, and lack of even a

23   modicum of cooperation for the past several months, there is a substantial risk of irreparable harm

24   to Lender if Debtors are authorized to use Lender's Cash Collateral.

25       5.    In addition, any proposed form of adequate protection offered by Debtors—whether

26   in the form of replacement liens, budget controls or projected cash flows—is illusory and

27   insufficient to prevent the continued diminution in value of Lender's collateral, given Debtors'

28   admitted misuse and diversion of Lender's collateral.  The proposed use of Cash Collateral should

1  therefore be denied.

2        6.        However, in the event this Court grants Debtors authority to use cash collateral on

3  an interim basis, Lender requests that, given Debtors' prior diversion of cash collateral and the

4  demonstrated risk that any assurances are illusory, the Court provide substantial adequate

5  protection to Lender as set forth more fully in paragraph 72 below, including, among other things,

6  strict time and use limitations, timely and verifiable reporting, and replacement liens. This is all the

7  more important here, as Debtors are seeking to pay payroll for 220 people who do not work for

8  Debtors and who publicly disclose on LinkedIn and other public forums that they work for

9  companies other than Debtors, at least one of which reportedly owes Debtors in excess of $3 million.

10  **BACKGROUND**

11    *A.  The Credit Facility*

12        7.        Pre-petition, Debtors were commercial printing and marketing businesses ultimately

13  owned by JAL Equity Corp., which is 100% owned by Salu. Pursuant to that certain Credit and

14  Security Agreement, dated as of June 6, 2024 (as may be amended, restated, supplemented or

15  otherwise modified from time to time, the "Credit Agreement," and collectively with the other

16  agreements executed in connection therewith, the "Loan Documents"), by and among Debtors and

17  Lender, Lender provided a revolving credit facility (the "Credit Facility") with a principal amount

18  of up to $30 million. A true and correct copy of the Credit Agreement is attached to the Lender

19  Dec. as Exhibit A. Lender Dec. ¶ 7.

20        8.        The loans are evidenced by, among other things, that certain Revolving Note dated

21  June 6, 2024 (as amended, the "Note"), in the original principal amount of $30,000,000. Exhibit

22  B; Lender Dec. ¶ 8.

23        9.        As security for payment of the Loans, each Debtor granted Lender a continuing

24  security interest in substantially all of such Borrower's assets, including but not limited to accounts,

25  goods, inventory, and equipment ("Collateral"). Lender Dec. ¶ 10; Credit Agreement § 5.01;

26  13.02(c).

27       10.      Lender's security interest in the Collateral is further evidenced by: (a) that certain

28  Deposit Account Control Agreement, dated as of July 24, 2024 (the "Wells Fargo DACA"),

providing Lender with control rights over its deposit accounts at Wells Fargo Bank, National Association ("Wells Fargo" and the "Wells Fargo Account"), a true and correct copy of which is attached to the Lender Dec. as Exhibit C; (b) that certain UCC Financing Statement (No. 20240068950H) filed against ColorArt with the North Carolina Secretary of State and all amendments thereto, a true and correct copy of which is attached to the Lender Dec. as Exhibit D; and (c) that certain UCC Financing Statement (No. 2024409767-0) filed against LVCG with the Nevada Secretary of State and all amendments thereto, a true and correct copy of which is attached to the Lender Dec. as Exhibit E.  Lender Dec. ¶ 11.

11.    In connection with the Credit Agreement, Salu agreed to hold Lender harmless and indemnify Lender from and against all loss, damage, or injury which Lender may in any manner sustain in connection with certain amounts and certain other obligations, pursuant to that certain Validity and Support Agreement, dated as of June 6, 2024 (as may be amended, restated, supplemented or otherwise modified from time to time, the "Guaranty").  *See* Exhibit F; Lender Dec. ¶ 12.

12.    All cash of Debtors, wherever located, represents either proceeds of loans from Lender or proceeds of the Collateral.  Lender has valid, duly perfected, first-priority liens in all of the cash of the Debtors, and these funds, along with the proceeds of the Collateral, constitute "cash collateral" within the meaning of section 363(a) of the Bankruptcy Code (all such cash, cash proceeds, and other "cash collateral", the "Cash Collateral") of Lender.[2]

B. *Debtors' Defaults Under the Credit Agreement*

13.    In April 2025, Lender retained a consultant, Upfield Group ("Upfield"), to conduct a field exam to review and substantiate the Collateral being reported by the Debtors in their Borrowing Base Certificates.  Upfield reviewed Debtors' Borrowing Base Certificates, financial

---

[2]    For the record, Debtors' diversion of its cash out of the accounts in which Lender holds a security interest does not change the cash's status as Lender's Cash Collateral. Debtors cannot hide behind their theft to undermine Lender's liens. *See, In re Delco Oil, Inc.*, 599 F.3d 1255, 1260–61 (11th Cir. 2010) ("[o]therwise, a debtor could circumvent Section 363(c)(2)'s prohibition on the use of cash collateral without the secured creditor's or bankruptcy court's permission by distributing cash proceeds it knows are subject to a security interest as it likes, knowing that once distributed the proceeds would not be defined as cash collateral under Section 363(a) and, therefore, the transfer would not violate Section 363(c). Such an outcome would render Section 363(c) virtually meaningless, leaving a debtor generally free to transfer cash or its equivalent that is subject to a security interest")

reports and other documents and discovered a host of errors, red flags, inconsistencies, and gaps, forcing it to conclude that the field examination result was "unsatisfactory." Among other things, Upfield discovered:

    a. Irregularities with invoices, including (i) 38 invoices with duplicate invoice numbers, with 17 confirmed by Debtors which resulted in an overstatement of accounts receivable by $2,201,466.83 and Availability by $1,871,246.80 and (ii) 35 invoices with unexplained changes to invoice dates or amounts from month to month.

    b. Lender eventually concluded that the overstatement was intentional, as invoice accounting software is expressly intended to avoid "duplicate invoicing" and does not permit separate invoices to be issued with the same number. Any invoices would have had to be changed manually.

    c. Debtors' Excess Availability[3] was over-stated in their Borrowing Base Certificates on numerous occasions, even after Debtors attempted to re-state them. For example, in May 2025, Debtors over-stated its receivables by $1,170,000, which would equate to a $994,500.00 overstatement in Excess Availability (this over-statement made it appear that they had Availability under the Credit Facility, when in actuality they had none).

    d. Upfield was unable to validate/reconcile customer balances from one Borrowing Base Report to the next due to discrepancies in Debtors' records regarding what clients owed what as well as misapplications of payments.

    e. $2,224,127.77 in unaddressed, past due sales tax liabilities.

*See*, Lender Dec. ¶ 15.

14.    As part of the field exam, Lender also sought to independently verify the accounts receivable being reported by Debtors. This is typically done in one of two ways: (a) direct "portal" access to customers where the field examiner is able to go directly onto the customer's website to verify invoices and amounts, or (b) for smaller customers without portals, direct email communications with the customer, at the customer's email address, to verify accounts receivable. Lender Dec. ¶ 16.

15.    Lender and Upfield requested direct portal access to Debtors' major customers (Macy's, Centene, and American Express) to verify accounts receivable months ago, but to date, Debtors have refused to provide it. Lender Dec. ¶ 17.

---

[3] "Availability" means, at any time, the amount, if any, by which the Borrowing Base exceeds the sum of the outstanding principal balance of the Revolving Loans.

16.     With regard to direct customer verification through email, Debtors were repeatedly asked to provide valid customer contact information and consistently refused.  After months of delay, in September 2025, Lender's field examiner  was provided with customer email addresses. Upfield then conducted a standard verification by emailing those customers to confirm the existence of invoices and amounts due.  Only one customer responded to the inquiries and several were returned as undeliverable.  Lender Dec. ¶ 18

17.     The only customer who did respond to the verification requests was an affiliate of Debtors.  That affiliate confirmed a handful of minor invoices that were less than $1,000 each, but eventually confirmed—through three separate employees—that the four biggest invoices *representing $2.6 million* literally "do NOT exist."

From: Rainbow Lee <rlee@moneymailer.com>
Sent: Monday, September 15, 2025 2:19 PM
To: Joe Walsh <joseph.walsh@upfieldgroup.com>
Cc: joseph.creamer@marketing.com; AP <ap@moneymailer.com>; Lupe Duran <lduran@moneymailer.com>
Subject: RE: Money Mailer/Color Art Balance Validation (7/31/25)

Joe, please reach out to me @ ap@moneymailer.com for all AP related questions.

These are the invoices in question. My notes are in RED. Please let me know if you need further clarification.

| No. | Date | Due date | Inv Amt | Balance | MM NOTES |
|---|---|---|---|---|---|
| INV-DAS-65089 | 8/6/2025 | 11/4/2025 | $586.25 | $586.25 | INVOICE DATED 08/06/2025 |
| INV-DAS-65053 | 6/10/2025 | 9/8/2025 | $673.75 | $673.75 | MATCHED, TERMS IN MM SYSTEM - NET 90 |
| INV-ASG-11842 | | | | | 9/15/25 Mary Ruggiero confirmed this inv do NOT exist |
| INV-DAS-16507 | | | | | 9/15/25 Mary Ruggiero confirmed this inv do NOT exist |
| INV-DAS-65965 | | | | | 9/15/25 Mary Ruggiero confirmed this inv do NOT exist |
| INV-DAS-79435 | | | | | 9/15/25 Mary Ruggiero confirmed this inv do NOT exist |

*See* <u>Exhibit G</u>; Lender Dec. ¶ 19.  Ironically, one of these ostensibly third-party "moneymailer" employees, Lupe Duran, is now listed as an employee that Debtors seek to pay from Lender's cash collateral through their wage motion.

18.     The submission of false and misleading Borrowing Base Certificates is a material breach of the Credit Agreement.  Lender relied on the information contained in the Borrowing Base Certificates to determine Debtors' eligibility for additional advances of funds, and to evaluate its own collateral position for the Loans. By falsely inflating the eligibility of the A/R, Debtors received funds to which they were not entitled, and seriously jeopardized Lender's collateral position.

19.     Debtors also repeatedly refused to provide financial projections or budgets to

Lender, even after they had defaulted under the Loan Documents. The first budget that Lender has seen from Debtors in 2025 was the one-page document attached to Salu's omnibus declaration, which is insufficient to assess Debtors' financial condition or ability to manage Cash Collateral. Lender's counsel has also issued document requests seeking supporting materials and requested depositions of Debtors' alleged accounting team, Steve Paley and James Creamer; but to date, Debtors' counsel have declined to make either the documents or the individuals available for examination, further obstructing Lender's ability to verify Debtors' financial information. Lender Dec. ¶ 20.

20.     In addition, Debtors have failed to maintain the required Fixed Charge Coverage Ratio of at least 1.25:1.00. Lender Dec. ¶ 21.

21.     Each of these failures, omissions, and misrepresentations constituted Events of Default under Section 13.01(b)[4] and (d)[5] of the Credit Agreement and Debtors were advised by notice of same. Lender Dec. ¶ 22, Lender Dec., Exhibit H.

22.     In addition to the foregoing issues with accounts receivable reporting, Lender also identified false and misleading statements in Debtors' inventory and equipment reporting, which Lender relied on to its detriment to advance funds to which Debtors were not entitled. Specifically, Debtors issued "invoices" that did not relate to their core business functions in connection with the sale of Equipment that was not actually sold at the time that the "invoices" were issued. The Debtors created the invoices for these equipment sales—and borrowed against these receivables—months before the sales contracts were even signed. At the same time, the Equipment, which was already accounted for in Debtors' Borrowing Base, was also being counted as a receivable pursuant to the "invoice." In other words, this "double counting" of Equipment (the equipment itself and invoices for its sale) caused Lender to advance more funds than were allowed under the Credit Agreement. These errors caused a $995,000 reduction in availability and put Debtors in an

---

[4] "The failure of any Loan Party to perform, keep or observe any of the other covenants, conditions, promises, agreements or obligations of such Loan Party under any of the Loan Documents…"

[5] "The making or furnishing by any Loan Party to [Aequum] of any representation, warranty, certificate, schedule, report or other communication within or in connection with the Loan Documents or in connection with any other agreement between such Loan Party and [Aequum], which is untrue or misleading in any material respect as of the date made…"

overadvance position.  Lender Dec. ¶23.

23.     On September 24, 2025, a notice was sent to Salu under the Guaranty which indicated:

> As you know, the Lender has raised significant concerns regarding the existence, validity and/or authenticity of certain accounts receivable reported by the Debtors, including approximately $2,653,707 of receivables with respect to Money Mailer, LLC and approximately $1,269,195 of receivables with respect to Growmail, LLC—both of which are Specified Affiliate Account Debtors as described and defined in the Validity and Support Agreement. In connection with its review and verification of such accounts, including with respect to the Specified Affiliate Account Debtors, the Lender and its advisors have on numerous occasions requested detailed information and supporting documentation regarding such accounts. Despite such requests, the Debtors have failed to provide the requested information, and the limited documentation submitted by the Debtors to date are insufficient to validate or otherwise substantiate the receivables.

Lender Dec. ¶ 24.

24.     Through the date of the commencement of the Receivership Proceeding (as defined below), Debtors failed to supply adequate information to verify the current state of the Debtors' eligible accounts receivable, Equipment, and Inventory, *i.e.*, Lender's collateral.  Nor had they provided sufficient access or data from the customer portal to permit Lender to independently verify the reported information. Lender Dec. ¶ 25.

25.     In addition, Debtors' August 31, 2025 Borrowing Base Certificate (delivered thirty (30) days late) included Inventory and Equipment attributed to four facilities that they closed in Texas and Illinois where there was no longer any Collateral of value.[6] This resulted in Debtors overstating gross inventory by $464,000, resulting in a $278,000 overstatement of Excess Availability.  In other words, such Borrowing Base Certificate failed to describe Debtors' accurate financial picture. Lender Dec. ¶ 26.

26.     At the same time, despite multiple attempts by Lender, Debtors refused to provide any updated Borrowing Base Certificate to lender for the period after August 2025 and refused to provide Lender with any financials, both historical and projections, since July 2025. While Lender learned that it could not entirely rely on Debtors' Borrowing Base Certificates, any information

---

[6] For clarity, a 2024 appraisal valued the equipment at these closed locations at approximately $2,291,000.

144623.00601/117997159v.2                                    8

1   was better than none at all. Lender Dec. ¶ 27.

2        27.   On September 30, 2025, as result of these ongoing and uncured defaults, Lender

3   exercised its remedies in Paragraph 13.02(a) of the Credit Agreement, terminated any and all of its

4   commitments to lend or extend any credit to Borrowers, and declared all of Borrowers' Obligations

5   (including, without limitation, all principal, accrued and unpaid interest, all costs, fees, expenses

6   and all other items payable under the Credit Agreement and the other Loan Documents)

7   immediately due and payable (the "Acceleration Notice"). Lender Dec. ¶ 39. A true and correct

8   copy of the Acceleration Notice is attached to the Lender Dec. as Exhibit J.

9        28.   As previously explained, as support for Lenders' security interest, Debtors granted

10   Lender a first priority security interest, dominion, and information access over its bank accounts,

11   including at Wells Fargo. In addition, Debtors agreed not to open any new bank accounts without

12   giving Lender at least thirty days' prior notice and a first priority, perfected security interest in any

13   such accounts.  *See* Wells Fargo DACA and § 10.10 of the Credit Agreement. However, this

14   dominion and information access is only beneficial or helpful to Lender where Debtors are honest,

15   good actors, who actually comply with the requirements of the underlying account control

16   agreement and the Credit Agreement.

17        29.   On September 16, 2025, following the false reporting and amidst concerns about its

18   collateral, Lender issued an Access Termination Notice (the "Access Termination Notice"),

19   pursuant to which Lender instructed Wells Fargo not to permit any access or disposition over the

20   Wells Fargo Account or Collateral Account Funds (as defined in the Wells Fargo DACA) by any

21   person other than Lender, and not to honor or follow any instruction with regard to the Wells Fargo

22   Account or Collateral Account Funds from any party other than Lender.  Lender Dec. ¶ 29. A copy

23   of the Access Termination Notice is attached to the Lender Dec. as Exhibit I.

24        30.   Through Lender's monitoring of the Wells Fargo Account and a review of Debtors'

25   bank statements and financial disclosures, Lender observed that Debtors' deposits had significantly

26   decreased in a manner that was inconsistent with the financial reporting Debtors had provided,

27   raising serious concerns regarding the accuracy and reliably Debtors' cash flows. Lender Dec. ¶ 30.

28        31.   For example, Debtors indicated that they collected $11,955,384.13 in their August

31, 2025, Base Borrowing Certificate, but the collections from the Wells Fargo Account after Aequum issued the Termination Notice reflected a substantially less amount, nearly 10% of the amount indicated in the Base Borrowing Certificate.  Lender Dec. ¶ 31.

32.     By September 2025, Lender had come to suspect that Debtors and Salu were diverting funds from the Wells Fargo Account to other accounts outside of Lender's control – in contravention of the Credit Agreement. Lender Dec. ¶ 32.

33.     That suspicion was confirmed at an in-person meeting on September 29, 2025 between Salu and representatives of Lender, where Salu **admitted** to representatives of Lender that he had directed two Affiliates of the Debtors, MoneyMailer and GrowMail (both entities that are also ultimately owned by Salu), **not** to deposit funds due to Lender into the Wells Fargo Account. Lender Dec. ¶ 33.

34.     Salu admitted that "they were going to do what they had to do" because of Lender's refusal to issue additional advances because of Debtors' defaults. Salu repeated this position in another phone discussion with Lender's representative on October 3, 2025, and confirmed that Debtors' collections were routed to another account. Lender Dec. ¶ 34.

35.     Simultaneously with Lender's suspicion concerning Debtors' accounts, Lender attempted to exercise its right to inspect Debtors' Eureka, Missouri facility—and the existence and/or value of Collateral and books and records allegedly housed therein—through a consultant hired by Lender as allowed by the terms of the  Credit Agreement. Lender Dec. ¶ 38.

36.     However, Debtors refused to provide access to Lender's consultant and warned that Lender's consultant would be turned away if he attempted to enter the facility. Lender Dec. ¶38.

37.     At the same September 29, 2025 in-person meeting at the Eureka, Missouri plant referenced above, Lender's representatives were troubled to observe a less than bustling plant: machines were not running, a skeleton staff of workers was doing little, and there seemed to be very little Inventory present. Trash was piling up in a corner by one of the doors, and it appeared Debtors were not paying their waste management company. The scene was especially confusing because Lender had been advised that four other plants had been consolidated recently to promote scale and yet the volume of the Eureka plant appeared stagnant. Lender Dec. ¶¶ 36-37.

*C. The Appointment of the Receiver and Debtors' Continued Lack of Cooperation*

38.    As a result of numerous defaults under the Credit Agreement, Lender's inability to inspect its Collateral, Debtors' lack of cooperation, and the significant evidence that Debtors were converting Lender's Collateral, on October 7, 2025, Lender commenced an action against Debtors and Salu in the Circuit Court of St. Louis County, Missouri (the "Receivership Court"), in the case captioned *Aequum Capital Financial II LLC v. ColorArt LLC, et al.*, 25SL-CC11027 (the "Receivership Proceeding") seeking, *inter alia*, the appointment of a receiver over Debtors. Lender Dec. ¶ 40.

39.    At the evidentiary hearing on Lender's emergency motion for appointment of a receiver held before the Receivership Court on October 20, 2025, Salu admitted under oath, among other things, that: (a) he was directing the ongoing diversion of the Lender's Cash Collateral to the tune of approximately $5.2 million in the 30 days preceding such hearing, (b) he was using a previously undisclosed, unauthorized bank account ending 9501 (the "CNB Account") at CNB St. Louis Bank ("CNB") to funnel the diverted Cash Collateral, and (c) he and other members of management were continuing to use Lender's diverted Cash Collateral to pay vendors and payroll. The following excerpts from the hearing transcript further illustrate Mr. Salu's admissions and the scope of the ongoing diversion:

> Q. (By Mr. Dorsey)  You said you collected about seven million dollars total since September 15th, right?
>
> A. (By Mr. Salu)  Not me personally, but they've collected about two million, and we've collected about five million.
>
> Q. [The Lender] testified that they received about 1.5 million dollars on the loan. You guys got five and a half million, right?
>
> A. We received about five and a half, and we think – we received about 5.2 or something, and I believe they received close to two.  I also see the Wells Fargo account.
>
> Q. Does 5.2 million dollars that you diverted from the Wells Fargo account to another account over which this lender does not have a Deposit Account Control Agreement, right?
>
> A. Absolutely not.  It's within a ColorArt account used for ColorArt. It was only after they defaulted on their obligation to fund.
>
> Q. You get to decide if there has been a default, and you decide what happens to the money?

A. I think we were justified because otherwise we would have failed the customers, we would have fired the employees, and it would have decreased their collateral position.  It was a loss/loss for everybody.

Q. And you made a decision to make [the Lender] lose?

…

Q. You said it was a lose/lose situation, and you were the one who decided to make [the Lender] lose by diverting their cash from the account over which they has an Account Control Agreement to one where they didn't, correct?

A. They didn't fund draws that they were obligated to fund. And so in order to mitigate damages we did move the money to another ColorArt account. We knew that, of course, one day somebody would look and see that we only spent this on the ColorArt business, but we had no choice. The other choice was to fail the customers, fire the employees, and it would demolish, like the five million dollar Macy's billing wouldn't have happened if we did that.

(Oct. 20, 2025 Hr'g Tr. 166:4 – 167:18.). A true and correct copy of the Oct. 20, 2025 Hearing Transcript is attached to the Dorsey Dec. as <u>Exhibit A</u>.  A couple of weeks later, Lender learned that Debtors had actually set up at least four more secret accounts to which Lender's cash collateral was funneled.

40.    Immediately following Salu's admissions at the October 20, 2025 hearing, Lender issued a demand letter to CNB requesting an immediate freeze of all funds in the CNB Account, and prohibiting any further withdrawals, transfers, or other disbursements from the CNB Account. Lender Dec. ¶41. A true and correct copy of the CNB demand letter is attached to the Lender Dec. as <u>Exhibit K</u>.

41.    On October 29, 2025, the Receivership Court granted Lender's receivership motion, denied the Debtors' counter motions to stay the emergency receivership and dismiss the case, and entered an order appointing NMBL Strategies as the receiver (the "<u>Receiver</u>") of and over Debtors and any and all of their assets (the "<u>Receivership Order</u>"). A true and correct copy of the Receivership Order is attached to the Dorsey Dec. as <u>Exhibit B</u>.

42.    Pursuant to the Receivership Order, Salu – and any other person in possession of Receivership Property (as defined in the Receivership Order) – was to immediately turn over such Receivership Property, including information regarding and access to Debtors' financials, to the Receiver.

43.     Lender understands that the receiver is in the process of filing a motion and supporting declaration outlining Salu's refusal to comply with the receivership order's turnover and cooperation provisions and presumed, continued diversion of funds

44.     It appears that, post-receivership, only small amounts of money were being paid into the Debtors accounts, *at least to the accounts that Receiver or Lender had access to*.

45.     The Receiver has also identified numerous, questionable transfers, including $58.9 million to insiders and $400,000 to Missouri defense counsel—who were paid to defend the receivership using diverted funds

*D. Debtors' Chapter 11 Filing and the Cash Collateral Motion.*

46.     On November 5, 2025 (the "Petition Date"), Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). This is not a case where the parties were aligned on a chapter 11 filing, much less the specifics of use of Cash Collateral, especially given the Debtors' complete disregard for Lender's collateral.

47.     Lender has been requesting for months an updated Borrowing Base Certificate, aging report, verified accounts receivable information, and payroll detail, to no avail.

48.     On November 7, 2025, given Debtors' delay in filing the customary "First-Day Motions", Lender filed its motion to prohibit the use of cash collateral [ColorArt Docket No. 10; LVCG Docket No. 15] (the "Lender Cash Collateral Motion"). Simultaneously, Debtors filed their Cash Collateral Motions, pursuant to which they seek entry of an order authorizing Debtors' use of Lender's Cash Collateral.

49.     As the only support for the Cash Collateral Motion, Debtors filed an unsubstantiated budget containing amounts that entirely contradict Debtors' historical financial statements, in addition to being patently unsupported. To date, no supporting information for the budget has been produced in response to Lender's discovery requests or otherwise; and Debtors have refused to make Salu or the accounting teams available to answer questions.

50.     For example, among other things, when compared to Debtors' 2024 financials:

a.     The budget vastly overstates its projected collections. It assumes the company will collect $16.3 million between November 29, 2025, and January 2, 2026. Such amount is grossly higher than the $9 million that Debtors collected in December 2024, which per Salu's own testimony in the Receivership Proceeding, included the

business with Centene, one of Debtors largest *former* customers, whose collections made up nearly half a million dollars.

b. The budget vastly overstates Debtors' costs. For example, the budget projects rent costs of $568,288 per month, while Debtors actual June 2025 rent obligations were $483,017 per month, which included obligations for facilities in Amarillo and San Antonio, which Debtors no longer possess. Despite demand, no explanation has been provided.

c. The budget vastly overstates Debtors' cash flow. For example, Debtors generated $2,982,000 of cash flow after debt service over the 12 months ending June 30, 2025. Comparatively, Debtors represent in their budget to build up to $14,625,000 of cash over the next 13 weeks.

51. Without any credible evidentiary support for this proposed budget, neither Lender nor this Court can trust that the Debtors—who have made clear that they have no intention of acting in good faith by the terms of the Credit Agreement or any court order—can and will adhere to this budget.

52. Given Debtors' prepetition and post-petition conduct, Lender intends to move promptly for appointment of a Chapter 11 trustee.

## **ARGUMENT**

A. *Debtors May Not Use Lender's Cash Collateral Without Its Consent Unless They Meet Their Burden of Showing that Lender is Adequately Protected.*

53. Debtors must prove that Lender is adequately protected before this Court can allow the use of Lender's Cash Collateral. Lender holds a first-priority security interest in and lien on substantially all of Debtors' assets, including any cash proceeds from accounts receivable collections, such that any cash generated by the Debtors is Lender's Cash Collateral.

54. Debtors are prohibited from using Lender's Cash Collateral unless the Lender consents, or this Court, after notice and a hearing, authorizes such use. 11 U.S.C. §§ 363(c)(2), (e) and (p). If Debtors cannot offer adequate protection, then this Court must prohibit Debtors' use of the Cash Collateral absent Lender's consent because adequate protection of a secured lender's interest in cash collateral is *mandatory*. 11 U.S.C. § 363(e) ("[A]t any time … the court, with or without a hearing, shall prohibit or condition such use … as is necessary to provide adequate protection of such interest."); 3 COLLIER ON BANKRUPTCY ¶ 363.05 (16th ed. 2023) ("[I]f a trustee seeks to use cash collateral and cannot obtain the consent of the entity with an interest in the

collateral, adequate protection must be furnished before the cash collateral can be used."); *In re Las Vegas Monorail Co.*, 429 B.R. 317, 326 (Bankr. D. Nev. 2010). As set forth more fully below, Debtors do not have Lender's consent to use Cash Collateral and the minimal and vague adequate protection provided in the Interim Order is inadequate to protect Lender's property interests in its Collateral.

55. The purposes of providing "adequate protection" is to ensure that a secured creditor receives in value essentially what he bargained for. *See, e.g., In re Geijsel,* 480 B.R. 238, 267 (Bankr. N.D. Tex. 2012) (citing *In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987)); *see also Bluebird Partners, L.P. v. First Fid. Bank*, 896 F. Supp. 152, 154 (S.D.N.Y. 1995) ("Adequate protection compensates the secured creditor for the diminution in value of the collateral during the period in which the automatic stay prevents the creditor from repossessing the collateral"); *In re Timbers of Inwood Forest Assocs., Ltd.*, 793 F.2d 1380, 1396 (5th Cir. 1986) (same); *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 207 (1983) (same).

56. Although the Bankruptcy Code does not define adequate protection, section 361 of the Bankruptcy Code states that it is intended to protect a secured creditor against a decrease in the value of its collateral resulting from the imposition of the automatic stay under Bankruptcy Code section 362(a) or the use, sale, or lease of such collateral, including cash collateral. 11 U.S.C. § 361; *see, Security Leasing Partners, LP v. ProAlert, LLC (In re ProAlert, LLC)*, 314 B.R. 436, 441 (9th Cir. BAP 2004); *In re Sharon Steel Corp.*, 159 B.R. 165, 169 (Bankr. W.D. Pa. 1993) (citation omitted); *see also In re Dunes Casino Hotel*, 69 B.R. 784, 793 (Bankr. D.N.J. 1986). Whether protection is adequate "depends directly on how effectively it compensates the secured creditor for loss of value" resulting from the debtor's use of the collateral. *In re Am. Mariner Indus., Inc*., 734 F.2d 426, 432 (9th Cir. 1984).

57. What constitutes "adequate protection" is a factual determination that is made on a case-by-case basis. *In re Mathis*, 64 B.R. 279, 284 (N.D. Tex. 1986). While adequate protection may take many different forms, section 361 of the Bankruptcy Code lists several potential varieties of protection, including periodic cash payments, replacement liens, and any other relief that "will result in the realization. . . of the indubitable equivalent of [the secured creditor's] interest in such

property." 11 U.S.C. § 361.

58.     The language of section 363(e) is straightforward and non-discretionary, and it imposes only the most minimal of burdens on the moving creditor. If a creditor (i) has an "interest in property" and (ii) makes a "request" for adequate protection, then the court "shall" prohibit or condition the use of such property on the provision of adequate protection. 11 U.S.C. § 363(e); *In re Metromedia Fiber Network*, *Inc.*, 290 B.R. 487, 491 (Bankr. S.D.N.Y. 2003)*; see also In re Worldcom, Inc.*, 304 B.R. 611, 618 (Bankr. S.D.N.Y. 2004) (noting that "section 363(e) essentially requires that where a creditor can demonstrate it has a security interest in the property, such creditor is entitled to adequate protection of such interest."). Beyond establishing these two simple prerequisites, nothing more is required of the creditor – not even a hearing. *See* 11 U.S.C. § 363(e) ("…with or without a hearing…").

59.     This restriction on use of cash collateral is critical "for the obvious reason that cash collateral is highly volatile, subject to rapid dissipation and requires special protective safeguards in order to assure that a holder of a lien on 'cash collateral' is not deprived of its collateral through unprotected use by the [Debtor]." *In re Earth-Lite, Inc.*, 9 B.R. 440, 443 (Bankr. M.D. Fla. 1981). Cash is the highest, best, and most secure form of collateral. *See, e.g.*, *In re Berens*, 41 B.R. 524, 527 (Bankr. D. Minn. 1984) ("[I]f the Debtor is allowed to use the cash collateral, the creditors' security—the collateral—is gone."). In other words, any order authorizing a debtor's use of cash collateral absent the secured party's consent must specifically address whether the secured party is adequately protected by such use and, if not, how the cash collateral use should be conditioned so that it is. *See Chrysler Credit Corp v. Ruggiere (In re George Ruggiere Chrysler-Plymouth, Inc.)*, 727 F.2d 1017 (11th Cir. 1984); *In re Dynaco Corp.*, 162 B.R. 389 (Bankr. D.N.H. 1993).

60.     Adequate protection may be furnished in a variety of forms and section 361 of the Bankruptcy Code provides an illustrative guide. *See* 11 U.S.C. § 361. In short, because Lender does not consent to Debtors' use of their Cash Collateral, Debtors must make compensatory payments to Lender, provide the Lender with additional or replacement liens, and/or provide Lender with the indubitable equivalent of their interest in the property. *See id*.

61.     Lender must also be fully and adequately compensated for the diminution in value

that has resulted and will result from the use of its Cash Collateral.  Further, section 363(c)(4) of the Bankruptcy Code requires Debtors to immediately account to Lender for all Cash Collateral in its possession, custody or control, and to segregate all such Cash Collateral.  11 U.S.C. § 363(c)(4); *In re LightStyles, Ltd.*, No. 1:12-BK-03711 MDF, 2012 WL 3115902, at *3–4 (Bankr. M.D. Pa. July 27, 2012).

  **B.** *Debtors Have Not Established that Lender is Adequately Protected and Debtors Should be Prohibited from Using Cash Collateral.*

  62. Debtors bear the burden of proposing an adequate protection package.  11 U.S.C. § 363(p)(1); *see In re Swedeland Dev. Group*, 16 F.3d 552, 564 (3d Cir. 1994); *Save Power Ltd v. Pursuit Athletic Footwear, Inc. (In re Pursuit Athletic Footwear, Inc.)*, 193 B.R. 713, 716 (Bankr. D. Del. 1996) (holding the debtor has the burden to show adequate protection has been provided); *Hari Ram, Inc. v. Magnolia Portfolio, LLC (In re Hari Ram, Inc.)*, 507 B.R. 114, 120 (Bankr. M.D. Pa. 2014); *Roach Automotive, L.P. d/b/a West Pointe Chrysler Dodge v. Daimler Chrysler Fin. Servs. Am., LLC (In re Roach Auto., L.P.)*, 540 B.R. 146, 151 (Bankr. W.D. Pa. 2007) ("The burden of proof on the issue of adequate protection falls squarely on the Debtor."); s*ee generally,* 3 COLLIER ON BANKRUPTCY ¶ 363.05 (16th ed. 2023).  While a debtor may address the form of adequate protection, a creditor's right to adequate protection is established simply by virtue of the creditor's request. *See In re Torres Dev., L.L.C.*, 413 B.R. 687, 695 (Bankr. S.D. Tex. 2009); *In re Carbone Cos., Inc.*, 395 B.R. 631, 635 (Bankr. N.D. Ohio 2008).

  63. Indeed, "the [d]ebtors' standard in cash collateral cases is a high one." *First Bank of Miller v. Wieseler*, 45 B.R. 871, 876 (D.S.D. 1985).  Debtors, and not the court, must frame the adequate protection package. *In re Blehm Land and Cattle Co.*, 859 F.2d 137 (10th Cir. 1988); *see also* H.R. REP. NO. 595, 95th Cong., 1st Sess. 339 (1977) ("[T]he debtor in possession will provide or propose a protection method").  The standard in cash collateral cases is high because cash, once spent, is permanently removed from a secured lender's collateral base.  Cash is the highest, best, and most secure form of collateral. *See*, *e.g.*, *In re Berens*, 41 B.R. 524, 527 (Bankr. D. Minn. 1984) ("[I]f the [d]ebtor is allowed to use the cash collateral[,] the creditors' [s]ecurity – the collateral – is gone"); 3 COLLIER ON BANKRUPTCY ¶ 363.05 (3d ed. rev. 2005).

64.     To satisfy its burden, a debtor's proof of adequate protection must be premised on facts or projections with a firm evidentiary basis, as opposed to mere speculation.  *See Pursuit Athletic Footwear*, 193 B.R. at 716 (confirming that Debtor seeking non-consensual use of secured creditors' cash collateral bears the burden of proving adequate protection); *see also Hari Ram*, 507 B.R. at 120 (denying debtor's motion for non-consensual use of cash collateral in the form of hotel rents where lender's prepetition security interest attached post-petition and the offer of a replacement lien would be "meaningless"); *In re LightStyles, Ltd.*, No. 1:12-BK-03711 MDF, 2012 WL 3115902, at *4 (Bankr. M.D. Pa. July 27, 2012) (denying debtor's motion to use cash collateral on a non-consensual basis for a limited duration of thirty days, where the request was "based on the thinnest of evidence").

65.     Importantly, simply "needing" the use of cash collateral for continued operations is not a basis for allowing the use of cash collateral.  *In re GVM, Inc.*, 605 B.R. 315, 325 (Bankr. M.D. Pa. 2019)*; In re McCutchen*, 115 B.R. 126, 133 (Bankr. W.D. Tenn. 1990) (denying use of cash collateral, holding that "mere need does not satisfy the requirements of sections 361 and 363"); *see also In re Goode*, 235 B.R. 584, 590 (Bankr. E.D. Tenn. 1999) (same).  While the Court must be flexible in applying the adequate protection standard, "such flexibility must not operate to the detriment of the secured creditor's interest."  *In re McCombs Props. VI, Ltd.*, 88 B.R. 261, 267 (Bankr. C.D. Cal. 1988).

66.     Debtors should not be permitted to use Lender's Cash Collateral because their own admitted prepetition diversion of funds renders any proposed adequate protection illusory.  Debtors have failed to provide any credible evidence regarding the existence, preservation or value of Lender's collateral.  As the record demonstrates, Salu, on behalf of Debtors, diverted millions of dollars from the Wells Fargo Account prior to the Petition Date, depriving Lender of its secured interest.  Given the history of diversion, there is no reasonable basis to rely on Debtors' representations regarding post-petition revenue or the continuation of business operations.

67.     At every turn, Debtors have acted in bad faith to defraud Lender into lending more money and to conceal the true state of their assets and operations. Debtors intentionally double-counted invoices to overstate their availability and improperly double-counted equipment as

eligible receivables before contracts were signed and outside of their core business, while simultaneously seeking to borrow based on that same, purportedly sold equipment. When Lenders attempted to verify their receivables, Debtors refused to give Lender access or valid customer email addresses. When Lender was actually able to connect with Debtors' customers, the only responding customer, an affiliate, explained that $2.6 million in invoices "do NOT exist," while the remaining $20 million plus of receivables were unverifiable. Debtors also refused to provide financial projections, proper access to Debtors' facilities, or updated Borrowing Base Certificates.  Most significantly, Debtors opened secret bank accounts to divert millions of dollars, deliberately placing funds beyond Lender's visibility and control.

68.    When Lender sought the support of the Missouri state court, which ultimately entered the Receivership Order in response to Debtors' bad faith conduct, Debtors continued to refuse to cooperate, ***despite a court order to do so***. Debtors refused to turn over assets to the Receiver and intentionally withheld operational and financial information necessary for the Receiver to implement the Receivership Order. And, again, Debtors continued to divert funds even from the Receiver and the receivership estate. Debtors have made clear that ***they have no intention of complying with court orders***, raising serious concerns about their ability or willingness to abide by any terms of a cash collateral order.

69.    Even the Bankruptcy Code does not appear to deter Debtors' conduct, which continues on a post-petition basis through dilatory and deceptive conduct. Debtors' proposed budget, which is the sole instrument upon which they rely to justify use of Lender's Cash Collateral, is wholly unreliable.  It is cursory, inconsistent with historical financials, and lacks any verifiable support.  Debtors also provide no assurance that Lender's Collateral will be preserved or used appropriately and solely for legitimate operational purposes.  Any reliance on such a budget as a mechanism for adequate protection is therefore entirely illusory in light of Debtors' pre-petition and post-petition conduct.

70.    Without any support, Lender – and this Court – have no ability to verify Debtors' financial projections, alleged payroll needs (for 200 alleged employees that don't appear to be working at any of the Debtors' facilities), alleged business operations (if any), and alleged ability

1   to reorganize.

2       71.     This is not an ordinary case where interim cash collateral relief might be justified

3   These Chapter 11 Cases are a bad faith filing designed to shield misappropriated funds rather than

4   facilitate a legitimate reorganization.  At the direction of Salu, Debtors have repeatedly diverted

5   cash away from Lender in violation of the Credit Agreement, obstructed efforts by its senior lender

6   and a court-appointed receiver to understand their financial condition, and refused to provide basic

7   operational and financial information.  Absent strict oversight, there is every reason to believe

8   Debtors will continue this pattern post-petition.  Granting Debtors authority to use Cash Collateral,

9   even on an interim basis, would effectively allow them to continue diminishing Lender's collateral,

10  making any purported adequate protection entirely illusory and the proposed budget wholly

11  unreliable. It is well within this Court's discretion to deny Debtors request to use Cash Collateral

12  in light of Debtors' conduct.[7]

13      *C. Lender Should be Afforded Meaningful Adequate Protection in this Case.*

14      72.     The proposed interim cash collateral order fails to provide critical adequate

15  protection for Lender. In the unlikely event that this Court grants Debtors authority to use Lender's

16  Cash Collateral, such authority should be strictly conditioned upon the following:

17          a.   Such authority be limited to no more than two weeks;

18          b.   Cash Collateral may be used solely for the actual and necessary expenses of Debtors

19               for that period set forth in a budget approved by Lender, with any deviations

20               requiring Lender's prior written consent;

21          c.   Debtors shall be prohibited from using Lender's Cash Collateral for any purpose

---

[7] *In re Delco Oil, Inc.,* United Stated Bankruptcy Court for the Middle District of Florida, Case No. 3:06-bk-03241-PMG, D.I. 91 (denying debtor's motion for authority to use cash collateral citing debtor's inability to provide adequate protection); *In re Ohannes Karamoussayan*, 656 B.R. 652 (1st BAP, 2024) (affirming bankruptcy court's denial of interim use of cash collateral, twice, where debtor failed to provide adequate budget projections or adequate protection, and ultimately dismissing debtor's chapter 13 case where debtor continued to use secured creditor's cash collateral in violation of the Bankruptcy Code and the court's order); *In In re Goode*, 235 B.R. 584, 590 (Bankr. E.D.Tex. 1999) (denying debtor's request to use cash collateral because debtor was unable to provide adequate protection and its only justification was mere need, and noting that the debtors could not offer any additional or replacement liens to the lender because the lender already had a valid and existing lien on all of the debtor's assets); *In re Visicon Shareholders Trust*, 478 B.R. 292, 314 (Bankr. S.D. Ohio 2012) (prohibiting use of cash collateral and dismissing debtor's chapter 11 case as a result of, *inter alia*, debtor's repeated post petition misuse of lender's cash collateral for personal expenses and other unexplained expenses).

outside the agreed-upon budget, including professional fees, distributions, or other expenditures, without Lender's prior written consent;

d. Detailed, timely, and verifiable reporting regarding Debtors' operations, cash flows, and compliance with the agreed-upon budget, including explanations for any material variances;

e. a release in favor of Lender, in form and substance acceptable to Lender, of any pre-petition claims against Lender;

f. monthly adequate protection payments to Lender equal to (i) postpetition non-default interest and reasonable fees and costs (including fees and costs of counsel and consultants to Lender) and (ii) all exam/appraisal costs as incurred by Lender;

g. granting of (i) senior replacement liens with continuing, valid, first-priority replacement liens on all postpetition assets of Debtors to the same extent and priority as existed prepetition and (ii) superpriority adequate protection claims with priority over all administrative expenses, including but not limited to, the kind specified in sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 552 or 726 of the Bankruptcy Code;

h. unlimited collateral inspection rights, including examination of inventory on reasonable notice by onsite examiners retained by Lender (such costs to be paid as adequate protection);

i. no intercompany transfers from Debtors, no affiliate sweeps/setoffs, and no cross-collateralization with affiliates;

j. Lender shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Collateral;

k. subject to the entry of a final order, granting use of Lender's Cash Collateral, Lender shall be entitled to (i) all of the rights and benefits of Section 552(b) of the Bankruptcy Code and the "equities of the case" exception shall not apply to Lender and (ii) a waiver by Debtors and their respective estates of the right to surcharge the Collateral, including Cash Collateral, pursuant to Section 506(c) of the Bankruptcy

1    Code; and

2        l.    automatic relief from the automatic stay upon the failure to comply with any orders

3            authorizing use of Lender's Cash Collateral.

4        73.    Imposing these conditions on the use of Lender's Cash Collateral will help ensure

5    that Lender is adequately protected and that they will receive the value of their bargained for rights

6    under the Loan Documents.

7                    **RESERVATION OF RIGHTS**

8        74.    This Objection is submitted without prejudice to, and with a full reservation of,

9    Lender's right to supplement and amend this Objection and to further object to the Cash Collateral

10    Motion on any grounds that may be appropriate

11        WHEREFORE, for all the foregoing reasons, the Cash Collateral Motion should be denied

12    and Debtors should be permitted to use cash collateral only as set forth herein.

13    Dated: November 10, 2025        /s/ *Samuel A. Schwartz*
                                Samuel A. Schwartz (NSBN 10985)
14                                Gabrielle A. Hamm (NSBN 11588)
                                Athanasios Agelakopoulos (NSBN 14339)
15                                SCHWARTZ LAW, PLLC
                                601 East Bridger Avenue
16                                Las Vegas, NV 89101
                                Telephone: (702) 802-2207
17                                saschwartz@nvfirm.com
                                ghamm@nvfirm.com
18                                aagelakopoulos@nvfirm.com
19
20                                -and-
21                                Kenneth J. Ottaviano (*pro hac vice* forthcoming)
                                William J. Dorsey (*pro hac vice* forthcoming)
22                                Stephanie K. Hor-Chen (*pro hac vice* forthcoming)
                                444 West Lake Street, Suite 1650
23                                Chicago, IL 60606
                                Telephone: (312) 776-2514
24                                ken.ottaviano@blankrome.com
                                william.dorsey@blankrome.com
25                                stephanie.horchen@blankrome.com
26
                                *Attorneys for Aequum Capital Financial II LLC*
27
28